Hiram **AMBURGEY,**
**Plaintiff–Appellant,**

v.

**CORHART REFRACTORIES
CORPORATION, INC.,**
**Defendant–Appellee.**

No. 90–1551.

United States Court of Appeals,
Fifth Circuit.

July 26, 1991.

Karl R. Steinberger, Bryant, Colingo, Williams & Clark, Pascagoula, Miss., for plaintiff-appellant.

William T. Reed, Pascagoula, Miss., Mary Ann Main, Jon L. Fleischaker, Wyatt, Tarrant & Combs, Louisville, Ky., for defendant-appellee.

Before BROWN, SMITH and WIENER, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The appellant, Hiram Amburgey, appeals from summary judgment for his former employer, Corhart Refractories, in this action under the Age Discrimination in Employment Act.[1]  Because there is no evidence giving rise to any genuine issue of material fact such that a factfinder could reasonably find that the company discriminated against Amburgey on the basis of his age in failing to transfer him when it closed its factory, we affirm the district court's summary judgment.

### The Story

Viewed in the light most favorable to Amburgey, the evidence reveals the following.  On January 4 or 5, 1987, Corhart announced that it would close its Pascagoula, Mississippi plant on July 1, 1987.  The plant's work force included 34 salaried and 90 hourly employees.  Between December of 1986 and August of 1987, the company transferred five salaried employees to Louisville, Kentucky and Buckhannon, West Virginia.  The company terminated 119 other employees at varying times between the January announcement and the July 1 closing.  Shortly before the July 1 plant closing, one more position in Buckhannon was filled, initially by a young ("thirty-something") transferee from Pascagoula.  That person changed his mind after a few days in Buckhannon, and the position was filled by promoting a Buckhannon employee, also "thirty-something," effective July 1.

Amburgey, a 49-year-old finishing foreman, was among those terminated.  His termination was effective April 15, 1987, after 28 continuous years with the company.  Amburgey's affidavit showed that he was qualified for three of the six jobs initially filled by Pascagoula transferees—supervisory positions in the finishing and maintenance departments.  Three other affiants, including two of the transferred employees and the company's general manager, swore that Amburgey, having served the company as a maintenance supervisor for four years and a finishing supervisor for approximately ten years, was qualified for the positions of finishing shift supervisor or maintenance supervisor.  The company disputes that Amburgey was quali-

---

1. ADEA, 29 U.S.C. §§ 621–634 (1982 & Supp. V 1987).  Section 623(a) prohibits discrimination on the basis of age by an employer.

fied for the maintenance positions. Looking at the evidence in the light most favorable to Amburgey for summary judgment purposes, we assume that he was qualified for the maintenance positions as well as the finishing position.

The three positions Amburgey contends he was qualified for were filled by Pascagoula transferees Floyd "Doc" Gillespie, finishing shift supervisor, Louisville; Daniel Raisor, maintenance supervisor, Louisville; and Garland Weaver, maintenance supervisor, Buckhannon. Amburgey offered evidence that all of these persons had less tenure with the company than he.

Two of the three positions for which Amburgey asserts he was qualified were filled by persons in the protected age group;[2] Gillespie was 49, Raisor 45, and Weaver 35. Furthermore, four of the six transferees were in the protected age group: Gillespie–49, Raisor–45, Hacy Green–45, and Gordon Stanley–48. Brenda Shelton, age 37, was made customer service supervisor in Louisville, a position for which Amburgey admittedly has no qualifying background, and Weaver was 35. The transfers were effective as follows. Gillespie was transferred December 1, 1986, *before* the impending plant closing was generally announced. Stanley was transferred April 28, 1987; Shelton, May 25, 1987; Raisor, June 1, 1987, and Green, August 1, 1987. Weaver was transferred from Pascagoula on a date unspecified in the record, during the summer of 1987, before the July 1 plant closing, to the position of maintenance supervisor of the Buckhannon facility. Amburgey was also considered for the Buckhannon maintenance supervisor position during that summer, well after his last day of employment with the company, April 15. Weaver was a shift foreman in the Pascagoula maintenance department—a position higher in the hierarchy than Amburgey's. Weaver quit in three or four days and returned to Pascagoula. The company reconsidered Amburgey in the summer of 1987, well after his last day of work in April, but filled the position by promoting a 36–year–old Buckhannon-based training supervisor, Tim Brannon, effective July 1.

The undisputed fact that Amburgey was considered to fill the position filled first in the summer by Weaver and then July 1 by Brannon supports Amburgey's assertion in his affidavit that he was advised on or near April 15 when he left the company to "keep in touch" for the purpose of checking on possible transfers for which the company promised he would be considered. The company, he said,

> "implied even though the plant in Pascagoula had been scheduled for shutdown, they were continuing to work for openings in other plants in which I might be placed. As a matter of fact, Mr. [Robert] Ayotte told me to keep in touch with him which I did, and after the date of my termination on April 15, 1987."

Ayotte, Corhart's president and CEO, acknowledged that he told Amburgey to "stay in touch," and that Amburgey called in the fall of 1987, asked about jobs, and was told that there were none. Amburgey's affidavit went on to say that pursuant to the instruction to stay in touch, "I contacted Mr. Ayotte in November of 1987 when he informed me that Corhart just did not have anything for me."

The undisputed evidence that the company continued to consider Amburgey for transfer after April 15, including consideration for the position filled by Tim Brannon on July 1, viewed in the light most favorable to Amburgey constitutes summary judgment evidence supporting i) his understanding of the instruction to stay in touch; ii) the company's acceptance of his claim that he was eligible to be considered as possible transfers opened up; and iii) his contention that the time of the November conversation was when he first had notice that he had no chance for a transfer position.

The company contends that Amburgey was not qualified, or was less qualified than those selected for the three positions, partly because of poor interpersonal skills exemplified in part by an incident where he allegedly offered to settle a dispute with a

---

**2.** The ADEA protects from discrimination persons at least 40 years of age. *Id.* at § 631(a).

subordinate by fighting it out on the back dock. Amburgey and the other employee both stated there was no such incident. Both did acknowledge, however, that the two had some sort of interpersonal difficulty, that Amburgey asked to discuss the matter with the employee outside the work environment, and that the employee complained to a superior about the problem.

Amburgey also stated that he was told that his long seniority and consequent high level of benefits affected the company's decision to terminate him in April of 1987 rather than letting him stay until the facility closed in July. The company denies this assertion.

Amburgey filed his charge of discrimination with the EEOC on March 8, 1988, nearly eleven months after his last day of work, April 15, 1987, and 14 months after the January, 1987 announcement that the plant would close, but less than 180 days after the November, 1987 notice from Ayotte that there was no chance he would be transferred. By letter dated April 28, 1988, the EEOC notified Amburgey of its finding that the evidence did not establish age discrimination. He filed suit in federal court on April 12, 1989, more than two years after the January, 1987 notice of the plant closing, but less than two years after his last day of work on April 15, 1987, and less than two years after the November, 1987 statement notifying him that he would not be transferred.

### Below

The district court granted summary judgment for Corhart, holding that although Amburgey was in the protected age group and was terminated, he had raised no genuine issues of material fact; he had not established a prima facie case for a reduction-in-force age discrimination claim;

and he had failed to timely file his claim with the EEOC or file suit in federal court. The court, on uncontroverted evidence specifically determined that others within the protected age group were retained and transferred, and that there was no issue of fact that as to those not within the protected group, the employer was entitled to determine that they were better qualified than Amburgey.

### Standard of Review for Summary Judgment

Summary judgment is reviewed de novo, under the same standards the district court applies to determine whether summary judgment is appropriate.[3] Summary judgment of course is proper when viewing all the evidence in the light most favorable to the non-movant,[4] "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."[5]

On a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[6] To defeat a defendant's motion for summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."[7]

### Limitations

Because we affirm on the merits, we need spend little time on Amburgey's contention that the ADEA's statute of limita-

---

**3.** *Brooks, Tarlton, Gilbert, Douglas & Kressler v. U.S. Fire Ins. Co.*, 832 F.2d 1358, 1364, *clarified on reh'g*, 832 F.2d 1378 (5th Cir.1987).

**4.** *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 192 (5th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Bache v. American Tel. & Tel.*, 840 F.2d 283, 287 (5th Cir.), *cert. denied*, 488 U.S. 888, 109 S.Ct. 219, 102 L.Ed.2d 210 (1988).

**5.** Fed.R.Civ.P. 56(c); *Williamson v. U.S. Dep't. of Agric.*, 815 F.2d 368, 373 (5th Cir.1987).

**6.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986).

**7.** *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

tions,[8] should have been equitably tolled. The ADEA requires a plaintiff to file a charge "with the Equal Employment Opportunity Commission within 180 days after the alleged unlawful practice occurred."[9] A civil suit may not be filed less than 60 days after the complaint is filed with the EEOC,[10] and must be filed within two years from when the cause of action accrued.[11] The cause of action generally accrues *when the employee receives notice* of the allegedly discriminatory decision, not when employment actually ceases.[12] Because he was notified in November of the company's decision that he would no longer be considered for possible transfers, for which he undisputedly had been considered as late as the July 1, 1987 promotion of Tim Brannon, Amburgey may, on the basis of the limited facts available in this record, have satisfied the 180–day and two-year filing times.

▆▆▆▆ Amburgey has argued, to refute Corhart's position that the limitations period began on his last day of work, that he believed that the company would consider him for possible transfer, and that the company's conduct in leading him to believe it would consider him requires equitable tolling of the statute, or at least requires that the clock for the limitations period not begin until November, 1987, when the company made it clear that it had nothing for him. In *Coke v. General Adjustment Bureau, Inc.*,[13] we permitted equitable tolling[14] where an employee's delay in filing was due to reliance on his employer's misrepresentation that he *would be reinstated.*

Here, it is undisputed that Corhart advised Amburgey to "stay in touch" to check on possible openings. But there is no factual support for the contention that Corhart made misleading promises that it *would* rehire Amburgey, such as those requiring equitable tolling in *Coke.* There *is* evidence, however, to support the contention that November, 1987 is the time for ADEA purposes when Amburgey was *notified* of the company's decision that he would no longer be considered for possible

**8.** 29 U.S.C. § 626(d)(1), (e)(1) (1982 & Supp. V 1987).

**9.** *Id.* at § 626(d)(1).

**10.** *Id.* at § 626(d).

**11.** *Id.* at § 626(e)(1).

**12.** *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Janikowski v. Bendix Corp.,* 823 F.2d 945, 947 (6th Cir.1987); *Wilkerson v. Siegfried Ins. Agency, Inc.,* 621 F.2d 1042, 1045 (10th Cir.1980).

**13.** 616 F.2d 785 (5th Cir.1980), *on reh'g* 640 F.2d 584 (1981).

**14.** Recently, in *Rhodes v. Guiberson Oil Tools Div.,* 927 F.2d 876 (5th Cir.1991), we quoted with approval a technical distinction drawn in a Fourth Circuit opinion between equitable estoppel and the more general concept of equitable tolling. A defendant is equitably estopped from asserting that a claim is time-barred where its conduct induced a plaintiff to refrain from exercising its rights. " 'Equitable tolling focuses on the plaintiff's excusable ignorance of the employer's discriminatory act.' " *Id.* at 878 (quoting *Felty v. Graves–Humphreys Co.,* 785 F.2d 516, 519 (4th Cir.1986) (also quoted in *Clark v. Resistoflex Co.,* 854 F.2d 762, 769 n. 4 (5th Cir.1988))).

Of course equitable estoppel and tolling intertwine where the clock is stopped, because a defendant has misled a plaintiff, until the plaintiff knows or should know the truth. Here, we use the term "equitable tolling" as it was used in *Coke.*

Our decisions have not recognized a plaintiff's excusable ignorance of the defendant's discrimination as a basis for equitable tolling. *Barrow v. New Orleans S.S. Ass'n,* 932 F.2d 473, 477–478 (5th Cir.1991), (citing *Blumberg v. HCA Management Co.,* 848 F.2d 642 (5th Cir.1988) (three bases for tolling statute of limitations include 1) pendency of suit in wrong forum; 2) plaintiff's unawareness, because of defendant's intentional concealment, of facts giving rise to claim; and 3) EEOC's misleading of plaintiff about nature of rights) *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 781 (1989).

While similar, this equitable tolling issue differs from the one currently splitting the courts of appeals regarding whether the limitations period begins to run the instant the discriminatory act occurs, *Hamilton v. 1st Source Bank,* 928 F.2d 86 (4th Cir.1990), or when the employee discovers it, *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446 (7th Cir.1990), *petition for cert. filed,* (U.S. Apr. 17, 1991) (No. 90–1697). In *Barrow,* we followed the Fourth Circuit's lead in *Hamilton* with regard to discriminatory seniority systems. Because we hold that Amburgey's claim is without merit, we need add nothing more today.

transfers, for which it *had* considered him as late as the summer of 1987.

In *Coke* we did not "address the question of whether tolling may be appropriate when the employer has made, not misrepresentations as to the likelihood of future reinstatement, but rather bona fide representations as to such likelihood, which, for some reason, were not fulfilled." [15]

The significance of the agreement to "keep in touch" is only to fix the *time*, for ADEA purposes, from which Amburgey had to take action within 180 days (by filing EEOC charge) and within two years (filing suit in federal court). Our reference to the agreement is not a determination or even a possible suggestion that the failure thereafter to consider Amburgey for transfer was discriminatory or a violation of the Act. It is simply, for limitations purposes, the latest time at which the clock may have begun to run, considered most favorably to the plaintiff.

Since our consideration of the merits— more accurately the lack of any merit— convinces us that Amburgey showed no right to relief, we proceed to the determination of the merits without considering whether the time began at this or an earlier date. This is certainly the best course in the interest of justice and good judicial administration.

### Failure to Establish a Prima Facie Case

We explained in great detail the significance of a prima facie case of age discrimination on a motion for summary judgment in the context of a reduction-in-force in *Thornbrough v. Columbus and Greenville R.R. Co.*[16] "[A] plaintiff can create a rebuttable presumption of intentional discrimination by establishing a 'prima facie case.'"[17] When a prima facie case has

been established, the burden of *production* shifts to the employer.[18] To overcome the presumption of intentional discrimination created by the establishment of a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for rejecting the plaintiff and selecting someone else. If he does not so rebut it, the presumption requires the factfinder to find for the plaintiff.[19] By articulating legitimate reasons for his decision, the employer rebuts the presumption, and the burden of persuasion shifts back to the plaintiff to prove that the reasons articulated by the employer are not true reasons, but pretexts.[20]

Because, as we shall explain, "it is relatively easy both for a plaintiff to establish a prima facie case and for a defendant to articulate legitimate, nondiscriminatory reasons for his decision, most disparate treatment cases are resolved at the third stage of the inquiry, on the issue of whether the defendant's reasons are pretextual."[21]

As in *Thornbrough*, the district court here "granted summary judgment on the ground that [the plaintiff] failed to present a prima facie case of employment discrimination."[22] As there, "[a]lthough the district court speaks of [the plaintiff] not having met his 'burden' of 'presenting' a prima facie case, we assume that the district court meant that [the plaintiff] did not raise a genuine issue of material fact as to the existence of a prima facie case. To make out a prima facie case, the plaintiff must prove the necessary elements 'by a preponderance of the evidence.' ... Even if the plaintiff has not succeeded in meeting this burden of proof, if he has raised a genuine issue of material fact, he should survive summary judgment."[23]

---

**15.** *Coke*, 616 F.2d at 790 n. 4.

**16.** 760 F.2d 633 (5th Cir.1985).

**17.** *Id.* at 639 (citations omitted).

**18.** The burden of proof, or persuasion, of course, remains with the plaintiff throughout the trial. *Id.* at 639 and 639 n. 5.

**19.** *Id.* at 639.

**20.** *Id.*

**21.** *Id.* at 639 n. 6.

**22.** *Id.* at 641.

**23.** *Id.* at 641 n. 8 (citations omitted).

■ Because in the ADEA context, prima facie case "refers to evidence that creates a legally mandatory, rebuttable presumption that the proposing party should prevail ... *there is no inherent relation between the failure to establish a prima facie case and summary judgment.* The failure to establish a prima facie case means merely ... that the factfinder is not *required* to find in the plaintiff's favor....

"Thus to the extent that the failure to establish a prima facie case warrants summary judgment, this is not due to the logical relation between the doctrines of prima facie case and summary judgment, but to the particular elements of a prima facie *employment discrimination* case.... Given these minimal requirements [for a prima facie case], *the failure to establish a prima facie case generally means that there are no material facts at issue.*"[24]

### What Makes Up a Prima Facie Case

With the proviso that "[t]he necessary elements of a prima facie employment discrimination case are not Platonic forms, pure and unchanging; rather, they vary depending on the facts of a particular case,"[25] in *Thornbrough*, we also addressed the factual differences between reduction-in-force cases and other age discrimination cases that led us in *Williams v. General Motors Corp.*[26] to elaborate special standards for a prima facie case in reduction cases. The most significant distinction is that " 'reduction-case plaintiffs are simply laid off and thus [are] incapable of proving ... actual *replacement* by a younger employee.' "[27]

■ The standard we articulated for reduction cases requires a plaintiff to show "that he is within the protected age group and that he has been adversely affected— *e.g.,* discharged or demoted—by the employer's decisions; (2) ... he was qualified to assume another position at the time of the discharge or demotion; and (3) produce 'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.' "[28] As to the last factor, which differs from the requirements for a prima facie case in other circumstances,[29] we said the plaintiff must " 'produce some evidence that an employer has not treated age neutrally.... Specifically the evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) that defendant regarded age as a negative factor in such consideration.' "[30]

Thus, a prima facie case is fairly easily made out. In *Thornbrough*, several younger, allegedly less well-qualified employees were retained during a reduction in force, and at the time of the plaintiff's discharge, two younger, allegedly less well-qualified employees were hired. We found this sufficient to establish a prima facie case.[31] We said, "[W]hat is suspicious in reduction-in-force cases is that the employer fired a qualified, older employee, but retained younger ones. If we focus ... on why the plaintiff rather than another employee was discharged, the discharge of an older employee rather than a younger one is initially unexplained. Under these cir-

---

**24.** *Id.* at 641 n. 9 (emphasis added).

**25.** *Id.* at 641.

**26.** 656 F.2d 120 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

**27.** *Thornbrough,* 760 F.2d at 642 (quoting *Williams,* 656 F.2d at 128). In the more general case, a plaintiff can establish a prima facie case of age discrimination "by showing merely that he was within the protected class, that he was qualified for the job in question, and that employees outside of the protected class were more favorably treated—for example, by being hired to a job for which the plaintiff was turned down

or by replacing the plaintiff in the job from which the plaintiff was discharged." *Id.* at 639 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973); *Price v. Maryland Casualty Co.,* 561 F.2d 609, 612 (5th Cir.1977)).

**28.** *Id.* at 642 (quoting *Williams,* 656 F.2d at 129).

**29.** *See supra,* note 29.

**30.** *Thornbrough,* 760 F.2d at 642 (quoting *Williams,* 656 F.2d at 129–30).

**31.** *Id.* at 643.

cumstances, requiring the employer to articulate reasons for his decision to fire the plaintiff is appropriate." [32]

■ Here, it is undisputed that Amburgey was in the protected age group, was adversely affected by the company's decision, and was qualified for three positions that were filled by persons retained by the company. He has also, like the plaintiff in *Thornbrough*, presented evidence that while he was dismissed, younger, allegedly less qualified persons were retained. Two of the positions were filled by persons younger than Amburgey,[33] and one of those was twice filled by a person outside the protected group.

As in *Thornbrough*, there was not only no statistical evidence of discrimination, but the statistics suggested the reverse. In *Thornbrough*, the company actually raised the average age of its employees as a result of the layoffs. Here, Amburgey was not the oldest employee dismissed, and most of the retained employees were in the protected age group. But as we said in *Thornbrough*, "[w]hile this evidence is probative of the age discrimination issue, it is not dispositive. The issue ... is whether the [defendant] discriminated against [the plaintiff], not whether it discriminated against other older employees." [34]

Amburgey has thus made out a prima facie case of age discrimination. Our inquiry does not end there, however. Corhart has responded by articulating a legitimate, non-discriminatory reason for its decision. The rebuttal is as easily made as the prima facie case, and the burden of production shifts back to the plaintiff. As

in *Thornbrough*, then, we must also determine whether the plaintiff "present[ed] a genuine issue of fact as to whether the reasons articulated by the [defendant] for discharging him were pretextual." [35] In *Thornbrough*, we held not only that the plaintiff had made out a prima facie case, but that he had met the burden of producing sufficient evidence to raise genuine issues of material fact as to pretext, thus surviving summary judgment. Amburgey has not.

### Pretext

■ The plaintiff can prove the employer's articulated reasons are pretexts "in two ways, 'either [1] directly by persuading the court that a discriminatory reason more likely motivated the employer or [2] indirectly by showing that the employer's proffered explanation is unworthy of credence.' " [36] Of course, "[i]n the context of a summary judgment proceeding, the question is not whether the plaintiff *proves* pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." [37] Amburgey fails to do so.

■ Amburgey's assertions that he was told his long seniority and greater severance pay benefits affected the company's decision to terminate him in April rather than letting him stay till the facility closed in July, and that the reduction in his retirement pay will benefit the company, are not relevant to age discrimination, but seniority.[38]

The employer insists that to make out a prima facie case, Amburgey needed evi-

32. *Id.* at 644.

33. "We have never demanded rigid adherence to the requirement that the plaintiff establish that he was treated unfavorably as compared with people outside of the protected class—*i.e.*, under age forty. For example, in *Wilson v. Sealtest Foods Div. of Kraftco Corp.*, 501 F.2d 84 (5th Cir.1974), we reversed a directed verdict in favor of the employer, even though the plaintiff was replaced simply by someone younger, not someone outside of the protected ADEA class.... 'That the person is replaced by a person ten years younger rather than twenty does not diminish the discrimination; the subtlety only tends to disguise it.' " *Thornbrough,*

760 F.2d at 643 n. 14 (quoting *McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 754 (5th Cir.1980)).

34. *Thornbrough,* 760 F.2d at 646 n. 20.

35. *Id.* at 641.

36. *Id.* at 639 (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207, 217 (1981)).

37. *Id.* at 646 (emphasis added).

38. "Seniority and age discrimination are unrelated." *Williams,* 656 F.2d 120, 130 n. 17 (5th Cir.1981).

dence that he was *better* qualified than those selected. While it is not for the court to decide on summary judgment the issue of who was *best* qualified, evidence that the plaintiff was *clearly better qualified* would be one way of showing that Corhart's explanation is a pretext. "[T]he issue ... is not whether [the plaintiff] or the retained employees were better qualified. The [employer] is entitled to make that decision for itself. The ADEA was not intended to be a vehicle for judicial second-guessing of business decisions, nor was it intended to transform the courts into personnel managers.... [I]f the factfinder determines that [the plaintiff] was *clearly better qualified* than the employees who were retained, it is *entitled to conclude that the [employer's] articulated reasons are pretexts.* Everyone can make a mistake—but if the mistake is large enough, we may begin to wonder whether it is a mistake at all." [39]

Amburgey, however, offers no such evidence or any other evidence of pretext beyond his own bald assertion that he has been discriminated against. In *Thornbrough*, where we found genuine issues as to pretext, we were "not faced merely with the conclusory allegation of [the plaintiff] that he was well qualified for his job." [40]

"[T]he salutary function of summary judgment in the employment discrimination arena [is that] summary judgment allows patently meritless cases to be nipped in the bud.... Where there is only an 'attenuated possibility' that a jury would infer a discriminatory motive' ... proceeding ... serves no useful function. The problem, however, is that there is no bright line demarcating when a 'genuine issue of fact' degenerates into an 'attenuated possibility.'" [41]

Instead of bright lines, then, we have reversed summary judgment when we

could at least perceive, as in *Thornbrough*, "through the dim mists ... a thin vapor." [42]

In *Simmons v. McGuffey Nursing Home, Inc.*,[43] however, we upheld summary judgment, stating, "The possibility of a jury drawing a contrary inference sufficient to create a dispute as to a material fact does not reify to the point even of a thin vapor capable of being seen or realized by a reasonable jury." [44]

Today, again, we see no lights, no vapors. While we still do not discern or define a bright line, the facts of this case are outside even the fuzzy shadows.

AFFIRMED.

---

**39.** *Thornbrough,* 760 F.2d at 647 (citation, footnote omitted; emphasis added).

**40.** *Id.* at 646 n. 22. *See, e.g., E.E.O.C. v. Exxon Shipping Co.,* 745 F.2d 967, 976 (5th Cir.1984) ("[P]retext cannot be established by mere 'conclusory statements' of a plaintiff who feels he has been discriminated against.")

**41.** *Thornbrough,* 760 F.2d at 645 n. 19 (citation omitted).

**42.** *Id.* at 648.

**43.** 619 F.2d 369 (5th Cir.1980).

**44.** *Id.* at 371.