**Randy BALLARD, Plaintiff,**

v.

**HEALTHSOUTH CORP., Defendant.**

**No. CIV.A. 3:00–CV–1011.**

United States District Court,
N.D. Texas,
Dallas Division.

May 25, 2001.

---

Edward B. Cloutman, III, Law Office of Edward B. Cloutman III, Dallas, TX, Stephen J. Chapman, Law Office of Stephen Chapman, Dallas, TX, for Plaintiff.

Thomas Edward Reddin, Gardere Wynne Sewell, Dallas, TX, L. Traywick Duffie, Kelly D. Ludwick, J. Keith Coates, Jr., Hunton & Williams, Atlanta, GA, for defendant.

## MEMORANDUM OPINION AND ORDER

BUCHMEYER, Chief Judge.

Now before the Court is Defendant Healthsouth Corporation's Motion for Summary Judgment, filed January 17,

2001. For the reasons set forth below, the Defendant's Motion is **GRANTED.**

## I. Background Facts

The Plaintiff, Randy Ballard, was hired by Health Images in August 1994 to work as a part-time CT/X–Ray technologist at the Health Images clinic located in South Arlington.[1] In January 1995, Ballard became a full-time employee. His duties included performing CT scans, x-ray procedures and MRI exams.

During his employment, Ballard received a total of four performance evaluations. In January 1995, his first evaluation indicated that he was a good employee, but that he needed to work on his punctuality. In September 1995, he received an "annual" performance evaluation, which again indicated that Ballard was a generally good employee who needed to improve in the areas of tardiness and attendance. Ballard's next evaluation, in August 1996, indicated that he was a good employee in most areas, but that he was not performing up to expected levels with regard to attendance and punctuality. Further, this evaluation criticized Ballard for sometimes being argumentative and confrontational with his coworkers.

After receiving the August 1996 evaluation, Ballard requested and received a transfer from Health Images' South Arlington clinic to its Hurst clinic. Ballard felt that the negative remarks on his latest evaluation were the result of a personality conflict with his South Arlington supervisor, Jackie Muenks. After his transfer, Muenks no longer had any supervisory authority over Ballard and the two have not spoken since his transfer.

On February 6, 1997, Ballard went to his doctor for treatment of pinkeye. At Ballard's request, his doctor also give him an HIV test. Ballard admits that he requested this test of his own accord and no one at Health Images asked him to have the

---

1. The Defendant, Healthsouth, purchased Health Images in March 1997.

test performed. On February 19, 1997, Ballard's doctor informed him that he had tested HIV-positive. Before this test, Ballard had never tested HIV-positive and was, quite understandably, devastated by this news. He subsequently took several vacation days to help recover from this blow.

After he returned to work on February 27, 1997, Ballard voluntarily disclosed the result of his HIV test to his Area Manager, Grady Hobbs, and asked Hobbs to keep this information confidential. At this time, Ballard also told Hobbs that he had been stuck with a needle during an incident with a seizing patient several months earlier. Ballard decided to tell Hobbs about his infection in part because of the needle stick and also because he was concerned that he might put his patients in danger, given that he was responsible for injecting patients with intravenous shots as part of his job duties. Ballard was not told by his doctors that he should or must disclose his infection to his employer.

Sometime during the day after Ballard disclosed his infection, Hobbs told Ballard that he would have to tell his own supervisor, Erin Masters, about Ballard's HIV-positive test. Hobbs then met with Masters at a restaurant and told her of Ballard's situation. Masters subsequently told her own supervisor, Regional Manager Bill Lane, of Ballard's test result to ensure that no follow up action was necessary under Health Images' established policies.

Shortly after Ballard told Hobbs of his infection, Ballard alleges that his former supervisor, Muenks, approached another Health Images employee and friend of Ballard, Tim Fast, and asked him whether he knew that Ballard "had AIDS." Ballard asserts that the only way Muenks could have learned of his infection was through Masters or Hobbs.

In March 1997, the Defendant purchased Health Images and Ballard continued working at the Hurst clinic, now as an employee of the Defendant. Then on April 16, 1997, Hobbs counseled Ballard and another Hurst clinic employee that they needed to improve on their punctuality and attendance, and that they should not plan in advance which one of them could call in absent on a particular day. Ballard alleges that during this consultation he was counseled more harshly than the other employee.

In June 1997, Ballard submitted a letter of resignation and gave two weeks' notice. At some point during these two weeks, Bill Lane met with Ballard, told him that he was a valued employee, and requested that Ballard rescind his resignation. Ballard admits that Lane appeared to be sincere in his request and Ballard subsequently decided to rescind his resignation.

In August 1997, Ballard received his third annual performance evaluation from his latest supervisor, Carmen Sizemore–Herber. This evaluation was decidedly worse than any of his past evaluations, rating his overall performance as below acceptable and needing substantial improvement. Noted on the evaluation were several complaints regarding Ballard's performance. These included his tendency to lose his temper in front of patients, his acting rude towards patients, and, as noted on previous evaluations, his tendency to be late or unreliable. As a result of this negative evaluation, Ballard was placed on probation for a period of ninety days. However, he did not suffer a loss in pay or any other change in his employment terms.

The day after receiving this negative evaluation, Ballard requested and was granted leave under the Family Medical Leave Act. His leave of absence lasted from August 7 until September 2, 1997. After he returned from this leave of absence, Ballard filed a charge of discrimination with the Equal Employment Opportu-

nity Commission ("EEOC") alleging that he had been discriminated against based on his sex and that he had been harassed by Masters, Muenks and Sizemore–Herber because he was HIV-positive. The charge was then forwarded to Masters for an investigation in which she determined that Meunks had not worked with Ballard at any time after he tested HIV-positive and, thus, could not have harassed or discriminated against him. She further determined that Sizemore–Heber had not taken his infection into account in any of her dealings with him. As such, Masters denied all charges to the EEOC.[2] Masters further contends that her conversations with Meunks and Sizemore–Heber during the investigation were the first conversations she had ever had with them in which Ballard's HIV-positive status was discussed.

Ballard continued to work for the Defendant throughout this time. Then, on December 22, 1997, he was written up for stating on his timecard that he had worked for an hour longer than he actually had. Finally, on January 19, 1998, Ballard resigned his employment without notice and has not worked for the Defendant since.

In February 2000, Ballard received a Notice of Right to Sue from the EEOC and on May 11, 2000 he brought this suit alleging violations of the Americans with Disabilities Act ("ADA"). Specifically, Ballard has alleged that as a result of his disability, being HIV-positive, the Defendant (1) violated the confidentiality provisions of the ADA by informing various employees about his HIV test result, and (2) discriminated against him by creating a hostile work environment.

## II. Analysis

### A. Summary Judgment Standard

"Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, 'there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law.'" *Wilson Industries, Inc., v. Aviva America, Inc.,* 185 F.3d 492, 494 (5th Cir.1999)(quoting *Amburgey v. Corhart Refractories Corp.,* 936 F.2d 805, 809 (5th Cir.1991)); Fed.R.Civ.P. 56(c). However, all reasonable doubts and inferences must be decided in the light most favorable to the party opposing the motion. *See Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 640 (5th Cir. 1985). Furthermore, as long as there appears to be some evidentiary support for the disputed allegations, the motion must be denied. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coke v. General Adjustment Bureau,* 640 F.2d 584, 595 (5th Cir.1981)(en banc).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the nonmoving party bears the burden of proof on a claim upon which summary judgment is sought, the moving party may discharge its summary judgment burden by showing that "there is an absence of evidence to support the nonmov-

---

**2.** Interestingly, Masters denied to the EEOC's investigator that she had *ever* been told that Ballard was HIV-positive. According to the investigator's notes from an interview on August 3, 1999, Masters said she only suspected that Ballard was ill because of his absences, but that no one told her he had HIV. This is in direct conflict with her and Hobbs' sworn declaration that Hobbs told her of Ballard's test result in March 1997.

ing party's case." *Id.* at 325, 106 S.Ct. 2548. Once the moving party satisfies this burden, the nonmoving party may then oppose the motion by going "beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designat[ing] 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## B. Ballard's ADA Claims

### 1. Breach of Confidentiality

The ADA prohibits discrimination against an employee based upon disability. 42 U.S.C.A. §. 12112(a)(1995). In this regard, the ADA sets out three specific circumstances under which an employer must protect the confidentiality of medical information obtained about its employees. *Id.* at § 12112(d). First, under section 12112(d)(3), an employer may require new employees to undergo a medical exam under certain circumstances and provided that "information obtained regarding the medical condition or history of the applicant ... is treated as a confidential medical record." *Id.* Second, under section 12112(d)(4)(A), an employer may require an employee to undergo a medical exam if the exam "is shown to be job-related and consistent with business necessity." *Id.* An employer must keep information obtained pursuant to such an exam confidential. 29 C.F.R. § 1630.14 (2000). Finally, under section 12112(d)(4)(B), an employer may "conduct voluntary medical examinations, ... which are part of an employee

health program available to employees," but the employer must treat information obtained as confidential. *Id.* Thus, to prove that the Defendant was required by the ADA to keep his HIV-positive status confidential, Ballard must first show that the Defendant obtained the information under one of these three sets of circumstances.

■ This is not a case in which the Defendant subjected Ballard to a pre-employment medical exam. Thus, section 12112(d)(3) does not apply here. Likewise, section 12112(d)(4)(B) does not apply because Ballard has not alleged that his infection was disclosed as the result of a voluntary medical exam, conducted by the Defendant, which was part of an employee health program. Thus, to show that the Defendant was obliged under the ADA to keep his HIV-positive status confidential, Ballard must show that the information was obtained through a *medical exam or inquiry* that was "job related and consistent with business necessity." 42 U.S.C.A. § 12112(d)(4)(A); 29 C.F.R. § 1630.14.

The undisputed facts of this case, however, show that the Defendant learned of Ballard's condition not through a job related medical exam, but through Ballard's own voluntary disclosure to Hobbs. In addition, Ballard did not learn that he was HIV-positive as the result of a job-related doctor visit, but rather as the result of a non-work-related visit to his personal physician. On these facts, it is difficult to see how Ballard could possibly show that his disclosure to Hobbs was made under circumstances for which the ADA mandates confidentiality.

Ballard points to the fact that the Defendant's own policy requires the reporting of accidents and injuries at the workplace,

such as needle-sticks.[3] Further, Ballard argues that OSHA regulations require employees to report any exposure incident which may expose them to bloodborne diseases, and that employers must then offer testing and keep the results confidential. Indeed, 29 C.F.R. § 1910.1030(f)(3) appears to require that employers offer a confidential medical exam to any consenting employee who reports an exposure incident to a bloodborne pathogen, including HIV.[4] *Id.* Ballard asserts that the company policy and the OSHA regulations combine to create a "standing job-related inquiry" into his HIV status. As such, he argues that his disclosure to the Defendant should be treated as though it were the result of a job related inquiry that is consistent with business necessity, despite the fact that it was voluntarily made after a private medical exam revealed his condition.

Ballard is correct that had he told the Defendant of the needle-stick incident at any time after it happened, the Defendant would have been required to offer him a confidential medical exam. Further, had Ballard consented to his blood being tested for HIV during this exam, the Defendant would have had to treat the results of his blood test as a confidential medical record. Unfortunately for Ballard, none of this happened. He did not report the needle-stick incident independently of his disclosure that he was HIV-positive. Instead, he visited his private physician for personal reasons, learned of his infection with HIV and then voluntarily disclosed this fact to the Defendant. At the same time

he disclosed this fact, he informed Hobbs that he was stuck with a needle at work several months earlier. But the fact remains that the Defendant made no inquiry as to Ballard's health, nor did Ballard receive a medical exam that was job related, which is what is necessary for him to claim that the ADA provides him with protection in this case. The fact that Ballard voluntarily disclosed information he obtained from a personal visit to his private physician is not a matter that the ADA was designed to handle. The facts of this case show that the Defendant made no inquiry of Ballard, nor did the Defendant have anything to do with Ballard's visit to his doctor. The fact that the Defendant *may* have made an inquiry of Ballard, or offered him a medical exam, had he disclosed that he was stuck with a needle at work does not change the fact that he did not disclose the needle-stick until after he also disclosed his HIV infection. Thus, the Court must hold that, as a matter of law, Ballard is not entitled to the protection of the confidentiality provisions of the ADA. If this Court were to hold otherwise, the effect of the decision would be to greatly expand the protection provided by the plain language of the statute. Such a decision is not a matter for this Court.

## 2. Hostile Work Environment

Ballard claims that after he disclosed to Hobbs that he was HIV-positive, several things changed at work which combined to create a hostile work environment. Specifically, Ballard alleges that: 1) he re-

---

**3.** The Defendant correctly points out that its policy regarding accidents in the workplace was not in place either at the time that Ballard was stuck with a needle, nor at the time he told Hobbs of his HIV infection, since the Defendant did not purchase Health Images until March 1997. Ballard has not presented any evidence regarding the policies of Health Images, but the Court assumes that the

Health Images policy regarding potential exposure to bloodborne illnesses was similar to, if not the same as, that of the Defendant.

**4.** Although this section's title ("Hepatitis B vaccination and post-exposure evaluation and follow-up") focuses on Hepatitis B, it appears to address exposure incidents to any bloodborne disease, including Hepatitis B and HIV.

ceived oral and written warnings about his performance in April and May 1997; 2) he received an unsatisfactory annual performance evaluation in August 1997; 3) he was made to work overtime when a full-time coworker quit and was subsequently replaced with a part-time coworker; and 4) he was counseled for objecting to his supervisor's attempt to get him to perform an exam that he was not trained to perform. Ballard asserts that these events, when considered in conjunction with their occurring so soon after he disclosed his illness, amount to the Defendant creating an impermissible hostile work environment in violation of the ADA.

■ The Fifth Circuit recently held that the ADA embodies a claim for disability-based harassment. *Flowers v. Southern Regional Physician Services*, 247 F.3d 229, 232 (5th Cir.2001). A claim for disability-based harassment under the ADA is "modeled after the similar claim under Title VII." *Id.* at 235 (quoting *McConathy v. Dr.Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir.1998)). Thus, to prove a cause of action for disability-based harassment, a plaintiff must show:

(1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Id.* at 235–36.

■ Harassment must be "sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *Id.* at 236. In deciding whether a working environment is abusive, a court must consider the evidence in its entirety, "including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Id.* at 236 (quoting *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir.1999)). Further, a court must be mindful of the fact that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Shepherd*, 168 F.3d at 874 (internal quotations omitted). Although determining what constitutes severe and pervasive discrimination is a fact-sensitive determination, motions for summary judgment can be used to "police the baseline for hostile environment claims" to ensure that non-actionable claims are not brought before juries. *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n. 8 (5th Cir.1999). Finally, in addition to proving that harassment created a subjectively abusive work environment, a plaintiff must show that the harassment was objectively offensive as well. *Id.* at 263. That is, the environment must be one that "a reasonable person would find hostile or abusive." *Id.*

In *Flowers*, the court held that there was sufficient evidence to support a jury finding of disability-based harassment. 247 F.3d at 237. In that case, the plaintiff, Flowers, disclosed to her immediate supervisor and friend, Margaret Hallmark, that she was HIV-positive. Almost immediately after this disclosure, Hallmark stopped socializing with Flowers and began eavesdropping on her conversations and spying on her at work. In addition, the defendant's regional president, William Cooper, became cold towards Flowers, refused to shake her hand and openly avoided her at work. Flowers was made to undergo four

drug tests in a one week period, despite the fact that she had never tested positive for drug use in the past. Further, she was written up three times in a row, starting one month after her disclosure, each time in a manner that the court likened to an "ambush." After the second write-up, she was placed on ninety days' probation, at the end of which period she was written up again and placed on probation a second time. In addition, she was treated in a hostile manner by Cooper, who went so far as to call her a "bitch" and to physically remove a tape recorder from Flowers' pocket during a consultation. Ultimately, Flowers, who had formerly been considered a good employee, was fired. On appeal from the jury verdict in favor of Flowers, the court held that the evidence did not "point so strongly and overwhelmingly against the verdict that reasonable persons could not disagree." *Id.*

■ The evidence presented by Ballard to show that he was subjected to a hostile work environment does not rise to the level set by the court in *Flowers.* Ballard rests his claim on four pieces of evidence. First, he points to the fact that he received an oral and a written warning to be less rude to clients in May and June, despite the fact that he felt that he had never been rude to a patient. Ballard next points out that his third annual evaluation was substantially worse than his past evaluations. The Court notes, however, that in addition to alleging that Ballard treated his patients in an unprofessional manner, much of the evaluation addressed issues that were of concern *before* Ballard disclosed his illness to the Defendant. Namely the fact that Ballard had difficulties with punc-

tuality and reliability. Third, Ballard explains that he was made to work harder than in the past after a full-time coworker left to take a different job and was replaced by a part-time employee. Finally, he was counseled for telling the Defendant's secretaries not to schedule him to perform an exam that he did not know how to perform.

While Ballard provides evidence that might raise doubts about how well he was liked by his superiors, his evidence does not rise to the level of proof of an abusive working environment. Indeed, Ballard has presented proof of four separate incidents in which he felt that he was being treated unfairly, which occurred over the course of about nine months. However, at the same time these events were taking place, Ballard admits to several other facts that counteract his allegations of severe or pervasive harassment at work. First, he admits that Hobbs treated him with kindness and sympathy when he learned of Ballard's infection. Further, Ballard took two leaves of absence for his emotional and physical well-being, with no negative repercussions or pressure placed upon him. Finally, when Ballard attempted to quit in August, Bill Lane asked him to stay in a manner that was sincere and persuasive enough to convince Ballard to stay. All of this is very different than the experience of the plaintiff in *Flowers,* who, over a period of eight months was written up three times, completely alienated by superiors who had previously been her friends, called names, physically isolated and mistreated, forced to take repeated, harassing drug tests and, ultimately, fired.[5] Ballard

---

**5.** In addition to *Flowers,* hostile work environment cases have traditionally set a high bar for the amount and type of proof necessary to proceed on the claim. *See, e.g., Shepherd,* 168 F.3d 871 (holding that plaintiff's evidence that her coworker discussed the col-

or of her nipples, remarked on her thighs while pretending to look under her dress, touched her several times along the length of her arm, and offered for her to sit on his lap at two separate office meetings was not severe enough to prove a hostile work environment);

538

has not raised enough evidence to show that he was harassed to a degree that was so severe and pervasive that it created an abusive work environment.

In sum, Ballard has failed to produce enough evidence to show that the Defendant's conduct was so severe or pervasive that it created an objectively abusive or hostile work environment. As such, he may not pursue a claim of hostile work environment against the Defendant and his claim must be dismissed.

## III. Conclusion

For the reasons set forth above, the Defendant's Motion is **GRANTED**.

It is so **ORDERED**.

*McConathy*, 131 F.3d 558 (holding that there was not sufficient evidence to state a claim of hostile work environment where plaintiff claimed that her supervisor became angry when she told him she would need surgery, told her he would not tolerate her health problems and that she had better get well, complained to her that she was abusing the company's health benefits, ordered her to take a business trip despite the fact that she was recovering from surgery and in pain, excluded her from business meetings, ignored her to the point that she delayed having another surgery rather than persist in notifying him that she needed it, and finally fired her).