**Stephen R. EBER, Plaintiff,**

v.

**HARRIS COUNTY HOSPITAL DISTRICT, Defendant.**

No. CIV. A. H–99–3450.

United States District Court,
S.D. Texas.

Feb. 1, 2001.

Keith Lovelace, Attorney at Law, Houston, TX, for Stephen R. Eber, plaintiff.

Barbara Ann Callistien, Attorney at Law, Christopher L. Janak, Office of Harris County Attorney, Houston, TX, for Harris County Hospital District, defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Harris County Hospital District's ("HCHD") motion for summary judgment and sanctions (# 16). HCHD seeks summary judgment on Plaintiff Stephen R. Eber's ("Eber") claims arising from alleged violations of the Americans with Disabilities Act ("ADA"). Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

### I. Background

Eber, who holds bachelor's degrees in biology and nuclear medicine as well as a law degree, alleges that he has suffered from venous stasis for a number of years. According to Eber, this condition, which causes blood to pool in his legs, has worsened over time. He contends that when employed by HCHD, the disease prevented him from standing or walking for extended periods of time and required him to elevate his feet periodically. Eber's condition, however, did not preclude him from working. He held the position of Nuclear Medicine Supervisor at Lyndon B. Johnson General Hospital ("LBJ") from April 18, 1991, through September 10, 1997, when he was transferred to another HCHD hospital, Ben Taub General Hospital ("Ben Taub"), where he was assigned to work as a nuclear medicine technician. Eber argues that the move from LBJ to Ben Taub was a demotion from a supervisory to a technical position, was accompanied by a decrease in pay, and was discriminatory in nature. HCHD denies that Eber's pay was decreased or that he was a victim of discrimination, citing performance-related reasons for the transfer.

Days after the transfer, Eber received a job offer from Lieber & Moore Cardiology Associates, P.A. ("Lieber & Moore") to perform nuclear medicine procedures in a clinical setting. On September 16, 1997, Eber resigned from HCHD and soon began working at Lieber & Moore, where he was employed as a nuclear medicine technician until May 12, 1998. On April 14, 1998, Eber was admitted to Cypress Fairbanks Hospital for treatment of a streptococcal infection in his legs. After he was discharged from the hospital on April 27, 1998, he experienced cardiac problems arising as a result of the leg infection, causing him to seek additional medical care. On June 6, 1998, Eber was admitted to Methodist Hospital, where he underwent aortic heart valve surgery. Although he lapsed into a coma for several weeks and suffered temporary multi-organ sys-

tem failure, he eventually recovered and was discharged from the hospital on July 26, 1998.

Dr. John Taxis ("Dr. Taxis") examined Eber on September 2, 1998, and released him to return to work on September 7, 1998. On September 8, 1998, Dr. James H. Pickett ("Dr. Pickett"), likewise, approved his return to work. Eber contends, however, that he was suffering from depression, and his wife prevailed on him to see a psychiatrist. On September 9, 1998, Eber consulted Dr. Larry Flowers ("Dr. Flowers"), a psychiatrist, who diagnosed him with major depressive disorder and prescribed Prozac. According to Dr. Flowers's affidavit, Eber "did not return to normal functioning for at least 9 months." Eber claims that during this period, he "could not do tasks such as driving a car, shopping for groceries, paying bills and in fact was in a zombie-like state and unable to function." According to Eber's deposition testimony, however, in mid-September 1998, he went to the offices of the Texas Workforce Commission ("TWC") and applied for unemployment compensation.

On April 27, 1999, approximately 594 days after his transfer, Eber signed a charge of employment discrimination, which his attorney forwarded to the EEOC the following day. This charge alleges that he was disabled during the time he was employed by HCHD and was constructively discharged when HCHD failed to accommodate his special needs arising from the disability. Eber was issued a notice of right to sue on July 12, 1999, upon the EEOC's dismissal of his charge as untimely filed. Eber instituted this lawsuit on October 8, 1999, alleging that HCHD had discriminated against him on the basis of a disability in violation of Titles I and II of the ADA.[1]

## II. Analysis

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and

1. HCHD asserts that Eber may not proceed on an employment discrimination claim under Title II of the ADA, arguing that such a claim is cognizable only under Title I of the ADA. In *Holmes v. Texas A & M Univ.*, 145 F.3d 681, 684–85 (5th Cir.1998), the Fifth Circuit addressed an employment discrimination case arising under Title II of the ADA, tacitly assuming that a public employee could bring such a claim. HCHD argues that *Holmes* was implicitly overruled when the Fifth Circuit affirmed the district court's decision in *Decker v. University of Houston*, 970 F.Supp. 575, 577–79 (S.D.Tex.1997), *aff'd*, 159 F.3d 1355 (5th Cir.1998). In *Decker*, the district court granted summary judgment on a state university professor's claims under Title II of the ADA, holding that with respect to a cause of action for employment discrimination, a public employee is limited to proceeding under Title I of the ADA. *Id.* at 579. HCHD, however, overlooks the Fifth Circuit's unpublished opinion in *Decker*, which recognizes a split of authority on the issue and states: "We need not decide at this juncture whether Title II of the ADA recognizes a claim for employment discrimination, or, if it does, whether a plaintiff must first exhaust his administrative remedies before bringing a suit for disability discrimination in an employment context under Title II." *Decker*, 159 F.3d 1355, (5th Cir.1998) (citing *Bledsoe v. Palm Beach County Soil & Water Conservation Dist.*, 133 F.3d 816, 821–22 (11th Cir.), *cert. denied*, 525 U.S. 826, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998); *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir.1995)); *see also Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1181–84 (9th Cir., *petition for cert. filed*, 68 U.S.L.W. 3129) (Aug. 10, 1999) (No. 99–243). While leaving the question of the applicability of Title II open, the court affirmed the district court's decision on an alternate ground, finding that the plaintiff had failed to establish that he suffered an adverse employment action because of his disability. *See Decker*. Thus, in this circuit, the availability of a cause of action for employment discrimination under Title II of the ADA remains open.

identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999); *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving party, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321–22; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *see Reeves,* 120 S.Ct. at 2110; *Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321; *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.1997), *cert. denied,* 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999); *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *see Marshall,* 134 F.3d at 321. "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves,* 120 S.Ct. at 2110 (citing 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529, at 299 (2d ed.1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* (quoting WRIGHT & MILLER, *supra,* at 300).

Nonetheless, "'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072. The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evi-

dence." *Little*, 37 F.3d at 1075; *see Hart*, 127 F.3d at 435; *Wallace*, 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir.1990) (citing *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; *Wenner*, 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

## B. *Deemed Admissions*

HCHD argues that Eber failed to reply in a timely manner to its request for admissions and that the requested admissions should, therefore, be deemed admitted. Deeming such requests to be true would effectively eviscerate Eber's causes of action against HCHD. The requested admissions include statements such as:

> It is admitted that your actions and/or inaction were the sole proximate cause of the alleged employment action taken by Harris County Hospital District (transfer).
>
> \*    \*    \*    \*    \*    \*
>
> It is admitted that you suffered no wrongful or illegal discriminatory action by Harris County Hospital District.

Thus, if the requested admissions were deemed admitted, Eber could not establish a *prima facie* case under the ADA, and the court would be compelled to dismiss his action summarily without further analysis.

Under the Federal Rules of Civil Procedure, if a request for admission remains unanswered, with no objection lodged, for more than thirty days after service of the request, it is deemed admitted. *See* FED. R. CIV. P. 36(a); *see also Becerra v. Asher*, 921 F.Supp. 1538, 1544 (S.D.Tex.1996), *aff'd*, 105 F.3d 1042 (5th Cir.1997). Any matter admitted under Rule 36(a) is conclusively established. *See* FED. R. CIV. P. 36(b); *see also Dukes v. South Carolina Ins. Co.*, 770 F.2d 545, 549 (5th Cir.1985). Accordingly, deemed admissions may serve as the basis for summary judgment. *See Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 70 (5th Cir.1994) (upholding trial court's summary judgment finding of alter ego status based on deemed admissions); *In re Liberty Trust Co.*, 903 F.2d 1053, 1056 (5th Cir.1990) ("court acted properly when it granted ... unopposed motion for summary judgment, particularly so in light of the deemed admissions"); *Stewart v. Jones*, 946 F.Supp. 466, 470 n. 4 (S.D.Miss. 1996) ("failure to respond to requests for admission can lead to a grant of summary judgment where the essential issue is deemed admitted by the non-responding party") (citing *Dukes*, 770 F.2d at 549).

The procedure for computing the thirty-day window for replying to a request for admissions is described in Rule 6(a) of the Federal Rules of Civil Procedure:

> The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the district court inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days .... As used in this rule and in Rule 77(c), "legal holiday" includes New Year's Day, Birthday of Martin Luther King, Jr., Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving

Day, Christmas Day, and any other day appointed as a holiday by the President or the Congress of the United States, or by the state in which the district court is held.

FED. R. CIV. P. 6(a). If the original request for admissions is delivered by mail, the thirty-day deadline is extended by three days. *See* FED. R. CIV. P. 6(e).

■ Here, HCHD claims that, according to the applicable rules, Eber failed to reply timely to its request for admissions. Specifically, HCHD states that it hand-delivered the request to Eber's attorney on January 21, 2000. Consequently, Eber's response would normally have been due on February 20, 2000. Eber did not mail his response until February 22, 2000. Nevertheless, neither February 20, 2000, nor February 21, 2000, were to be counted because February 20 was a Sunday and February 21 was George Washington's Birthday. *See* FED. R. CIV. P. 6(a). Consequently, when Eber served his response to HCHD's request for admissions on February 22, 2000, it was timely. *See id.* Hence, there is no basis for deeming the requests admitted.

## C. *Americans with Disabilities Act*

■ The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to individuals without a disability. *See* 42 U.S.C. §§ 12101–12113; 29 C.F.R. Pt. 1630, App.; *Ivy v. Jones,* 192 F.3d 514, 516 (5th Cir.1999); *Seaman v. CSPH, Inc.,* 179 F.3d 297, 300 (5th Cir.1999); *Burch v. Coca–Cola Co.,* 119 F.3d 305, 313 (5th Cir. 1997), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); *Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 804 (5th Cir.1997), *cert. denied,* 522 U.S. 1115, 118 S.Ct. 1050, 140 L.Ed.2d 113 (1998); *Taylor v. Principal Fin. Group,* 93 F.3d 155, 161 (5th Cir.), *cert. denied,* 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996). The ADA contains four codified

titles: Employment (Title I), Public Services (Title II), Public Accommodations and Services Operated by Private Entities (Title III), and Miscellaneous Provisions (Title IV). Under Title I, which covers employment discrimination, the Act provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 560 n. 7, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999); *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 801, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Seaman,* 179 F.3d at 300; *Coolbaugh v. Louisiana,* 136 F.3d 430, 438 n. 5 (5th Cir.), *cert. denied,* 525 U.S. 819, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998); *Foreman,* 117 F.3d at 804–05; *Taylor,* 93 F.3d at 162; *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995). "Although Congress generally included governmental employers in Title I, it exempted the federal government from that Title." *Zimmerman,* 170 F.3d at 1172 (citing 42 U.S.C. § 12111(5)(B)). Employees asserting claims under Title I of the ADA are required to follow the procedures applicable to Title VII actions, which require the timely filing of an EEOC charge. *See* 42 U.S.C. § 12117(a); *Zimmerman,* 170 F.3d at 1172; *Wagner v. Texas A & M Univ.,* 939 F.Supp. 1297, 1307 (S.D.Tex.1996); *Stafford v. Radford Cmty. Hosp., Inc.,* 908 F.Supp. 1369, 1374 (W.D.Va.1995).

Title II, sometimes referred to as the "Public Services" title of the ADA, provides: "Subject to the provisions of this subchapter, no qualified individual with a disability, shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Public enti-

ty," as used in the statute, includes any state or local government and any department, agency, or other instrumentality of a state or local government. *See* 42 U.S.C. § 12131(A) & (B). There is a split of authority among the circuits, however, as to whether Title II extends to claims of employment discrimination and, if so, whether a claimant must first exhaust his administrative remedies through the EEOC before bringing suit. *See Zimmerman,* 170 F.3d at 1183–84; *Bledsoe,* 133 F.3d at 821–22; *Doe,* 50 F.3d at 1265. As noted above, the Fifth Circuit has expressly declined to consider the issue. *See Holmes,* 145 F.3d at 684; *Decker,*

Nevertheless, the regulations promulgated by the Department of Justice under Title II cross-reference Title I of the Act in outlining the standards by which to assess claims of employment discrimination brought under Title II: "For purposes of this part, the requirements of title I of the Act, as established by the regulations of the Equal Employment Opportunity Commission in 29 C.F.R. part 1630, apply to employment in any service, program, or activity conducted by a public entity if that public entity is also subject to the jurisdiction of title I." 28 C.F.R. § 35.140(b)(1). Part 1630 of the EEOC regulations interpreting Title I of the Act covers the purpose of the Act, definitions, prohibitions, defenses, and specific activities permitted. *See Wagner,* 939 F.Supp. at 1309 (citing *Petersen v. University of Wis. Bd. of Regents,* 818 F.Supp. 1276, 1280 (W.D.Wis. 1993) (citing 29 C.F.R. §§ 1630.1–1630.16)). Part 1630 does not contain any reference to exhaustion of administrative remedies or to any other procedural requirements to be imposed on employees. *See Wagner,* 939 F.Supp. at 1309 (citing *Petersen,* 818 F.Supp. at 1280). Instead, the regulations that address processing administrative complaints under Title I of the Act are contained in a separate section of the EEOC regulations. *See* 29 C.F.R. part 1641; *Wagner,* 939 F.Supp. at 1309; *Petersen,* 818 F.Supp. at 1280.

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Cleveland,* 526 U.S. at 801, 119 S.Ct. 1597. "The ADA prohibits discrimination on the basis of disability 'to ensure that [such] individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others.'" *Deas v. River West, L.P.,* 152 F.3d 471, 482 (5th Cir. 1998), *cert. denied,* 527 U.S. 1035, 119 S.Ct. 2392, 144 L.Ed.2d 792 (1999) (quoting *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)).

To recover under the ADA, the plaintiff must prove that he was discriminated against on the basis of his disability. *See Kapche v. City of San Antonio,* 176 F.3d 840, 842 (5th Cir.1999); *Gonzales v. City of New Braunfels,* 176 F.3d 834, 836 (5th Cir.1999); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1024 (5th Cir.1999); *Hamilton v. Southwestern Bell Tel. Co.* 136 F.3d 1047, 1052 (5th Cir.1998); *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1092 (5th Cir.1996); *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 36 (5th Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997). The plaintiff may present either direct evidence of disability discrimination or employ an indirect method of proof utilized in other types of employment discrimination cases. *See Seaman,* 179 F.3d at 300; *Taylor,* 93 F.3d at 162; *Rizzo v. Children's World Learning Ctrs. Inc.,* 84 F.3d 758, 762 (5th Cir.1996); *Daigle,* 70 F.3d at 396; *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the absence of direct evidence of discrimination, the plaintiff can establish a *prima facie* case under the ADA by showing that:

(1) he has a "disability;"

(2) he is qualified for the job;

(3) he was subject to an adverse employment action; and

(4) he was replaced by a non-disabled person or was treated less favorably than non-disabled employees.

*See Seaman,* 179 F.3d at 300; *Burch,* 119 F.3d at 320; *Daigle,* 70 F.3d at 396; *see also Ivy,* 192 F.3d at 516; *Talk,* 165 F.3d at 1024; *Turco,* 101 F.3d at 1092.

### 1. *Existence of Qualified Disability*

The threshold requirement in any case brought under the ADA is a showing that the plaintiff suffers from a disability protected under the Act. *See Hamilton,* 136 F.3d at 1050; *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1119 (5th Cir. 1998); *Rogers v. International Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir.1996). The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *see Ivy,* 192 F.3d at 516; *Talk,* 165 F.3d at 1021; *Deas,* 152 F.3d at 475; *Pryor v. Trane Co.,* 138 F.3d 1024, 1026 (5th Cir.1998); *Hamilton,* 136 F.3d at 1050; *Sherrod,* 132 F.3d at 1119; *Still v. Freeport–McMoran, Inc.,* 120 F.3d 50, 52 (5th Cir.1997); *Robinson,* 101 F.3d at 36. The ADA further restricts the meaning of physical and mental impairment to:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. 29 C.F.R. § 1630.2(h)(1), (2); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 n. 5 (5th Cir.1995). "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life activities." *Id.* at 726; *accord Deas,* 152 F.3d at 479.

The ADA defines neither "substantially limits" nor "major life activities," but the EEOC's regulations under the ADA, which adopt the same definition of major life activities as used in the Rehabilitation Act, provide significant guidance. *See Dutcher,* 53 F.3d at 726; *see also Talk,* 165 F.3d at 1024; *Hamilton,* 136 F.3d at 1050; *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994), *cert. denied,* 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995); *Chandler v. City of Dallas,* 2 F.3d 1385, 1391 (5th Cir.1993), *cert. denied,* 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). " 'Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' " *Talk,* 165 F.3d at 1024–25; *Hamilton,* 136 F.3d at 1050 (quoting 29 C.F.R. § 1630.2(i)); *Dutcher,* 53 F.3d at 726; *Bolton,* 36 F.3d at 942; *Chandler,* 2 F.3d at 1390. " 'The statutory language, requiring a substantial limitation of a major life activity, emphasizes that the impairment must be a significant one.' " *Deas,* 152 F.3d at 479 (quoting *Forrisi v. Bowen,* 794 F.2d 931, 933–34 (4th Cir.1986)). A "fundamental statutory requirement" is that "only impairments causing 'substantial limitat[ions] in individuals' ability to perform major life activities constitute disabilities." *Kirkingburg,* 527 U.S. at 565, 119 S.Ct. 2162.

The factors to be considered in determining whether an impairment substantially limits a major activity include:

(1) the nature and severity of the impairment;

(2) its duration or expected duration; and

(3) its permanent or expected permanent or long-term impact.

See *Pryor*, 138 F.3d at 1026 (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)); *Hamilton*, 136 F.3d at 1050; *Oswalt v. Sara Lee Corp.*, 74 F.3d 91, 92 (5th Cir.1996); *Dutcher*, 53 F.3d at 726; *Bolton*, 36 F.3d at 943; *see also Deas*, 152 F.3d at 480. "'[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.'" *Pryor*, 138 F.3d at 1026 (quoting 29 C.F.R. part 1630, App., § 1630.2(j)); *see Hamilton*, 136 F.3d at 1051; *Rogers*, 87 F.3d at 759.

The EEOC's regulations define "substantially limited" as meaning:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j)(i), (ii); *see Talk*, 165 F.3d at 1025 n. 6; *Deas*, 152 F.3d at 480; *Pryor*, 138 F.3d at 1026 n. 12; *Hamilton*, 136 F.3d at 1050 n. 5; *Sherrod*, 132 F.3d at 1119; *Dutcher*, 53 F.3d at 726 n. 8. "'To determine whether a person is substantially limited in a major life activity other than working, we look to whether that person can perform the normal activities of daily living.'" *Pryor*, 138 F.3d at 1027 (quoting *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir.1996)); *accord Sherrod*, 132 F.3d at 1120. Disability status is ascertained on a case-by-case basis, as "'[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.'" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (quoting 29 C.F.R. Pt. 1630.2(j), App.); *accord Kirkingburg*, 527 U.S. at 566, 119 S.Ct. 2162; *see Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 860 (5th Cir.1999) (citing *Burch*, 119 F.3d at 315); *Deas*, 152 F.3d at 478. "The particularized inquiry mandated by the ADA centers on substantial limitation of major life activities, not mere impairment." *Ivy*, 192 F.3d at 516 (citing *Sutton*, 527 U.S. at 482, 119 S.Ct. 2139).

While "working" is listed as one of the major life activities, working "'does not necessarily mean working at a particular job of one's choice.'" *Bridges v. City of Bossier*, 92 F.3d 329, 335 (5th Cir.1996), *cert. denied*, 519 U.S. 1093, 117 S.Ct. 770, 136 L.Ed.2d 715 (1997) (quoting *Bolton*, 36 F.3d at 942); *accord McGuinness v. University of N.M. Sch. of Med.*, 170 F.3d 974, 978 (10th Cir.1998), *cert. denied*, 526 U.S. 1051, 119 S.Ct. 1357, 143 L.Ed.2d 518 (1999); *Deas*, 152 F.3d at 480–81; *Knapp v. Northwestern Univ.*, 101 F.3d 473, 480–81 (7th Cir.1996), *cert. denied*, 520 U.S. 1274, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997) (citing *Welsh v. City of Tulsa*, 977 F.2d 1415, 1417 (10th Cir.1992)); *Wooten v. Farmland Foods*, 58 F.3d 382, 385–86 (8th Cir.1995); *Dutcher*, 53 F.3d at 727. "Only if there is no evidence of impairment to the other major life functions is an impairment to working considered." *Talk*, 165 F.3d at 1025 (citing *Hamilton*, 136 F.3d at 1050 (citing *Dutcher*, 53 F.3d at 726 n. 10)); *accord Pryor*, 138 F.3d at 1026 n. 15.

"'[S]ubstantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Talk*, 165 F.3d at 1025 (quoting 29 C.F.R. § 1630.2(j)(3)(i)); *accord Zenor*, 176 F.3d at 860; *Deas*, 152 F.3d at 481; *Pryor*, 138

F.3d at 1027; *Hamilton,* 136 F.3d at 1051; *Sherrod,* 132 F.3d at 1120; *Still,* 120 F.3d at 52. An employee's "inability to perform one aspect of [his] job while retaining the ability to perform the work in general does not amount to a substantial limitation of the activity of working." *Dutcher,* 53 F.3d at 727 (citing *Chandler,* 2 F.3d at 1392 (citing *Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. 1328, 1343 (S.D.Tex.1987), *aff'd,* 863 F.2d 881 (5th Cir.1988))). " 'An impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one.' " *Sherrod,* 132 F.3d at 1120 (quoting *Chandler,* 2 F.3d at 1392); *see Knapp,* 101 F.3d at 479 (citing *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1249 n. 3 (6th Cir.1985)); *Dutcher,* 53 F.3d at 727.

■ An ADA claimant must prove that he was disabled at the time of the alleged discriminatory act. *See McDaniel v. Mississippi Baptist Med. Ctr.,* 877 F.Supp. 321, 326–27 (S.D.Miss.), *aff'd,* 74 F.3d 1238 (5th Cir.1995) (stating that a plaintiff must be a "qualified individual with a disability" at the time the adverse action occurred); *see also Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 884 (6th Cir.1996) (plaintiff must establish as part of *prima facie* case that she was a qualified individual with a disability at the time of the discriminatory act). "The legislative history of the ADA reveals that the term 'qualified' refers to whether the individual [was] qualified at the time of the job action in question." *Morton v. GTE North Inc.,* 922 F.Supp. 1169, 1178 (N.D.Tex.1996), *aff'd,* 114 F.3d 1182 (5th Cir.), *cert. denied,* 522 U.S. 880, 118 S.Ct. 205, 139 L.Ed.2d 141 (1997) (citing S.Rep. No. 116, 101st Cong., 1st Sess. 26 (1989)).

■ In the case at bar, Eber argues that his venous stasis "became progressively worse over the years and it affected the length of time [he] could be on [his] feet without having complications." The record demonstrates, however, that Eber was fully capable of performing his job as well as the normal activities of daily living while employed at HCHD. He admits that he never asked for an accommodation of his alleged disability in writing, and his alleged oral notification to HCHD regarding his condition sprang not from his regular work activity, but from his perception that he was being required to work an excessive amount of overtime. At deposition, Eber testified:

Q. Did you ever give any verbal notification to Dr. Hilliard about your leg condition, your alleged leg condition?

A. Yes.

Q. When?

A. At one of the meetings that I was at downstairs. These happened approximately once a year. They were talking about overtime and being on-call, and I was asked a question about how much more overtime on-call could I take, and I responded something along the lines of due to the nature of my leg, I was taking as much as I could, more than I could, in fact, and that it was very deleterious to my leg.

\* \* \* \* \* \*

Q. Paragraph 10, you state that you notified HCHD of your need for accommodation, that defendant well understood your need for accommodation; is that correct?

A. What paragraph is that, sir?

Q. 10.

A. Yes, sir.

Q. Okay. Who was it who well understood your need for accommodation?

A. Well, I hoped all of them had.

Q. Name them for me and give me an exclusive list.

A. Okay.

Q. Inclusive list.

A. I talked to Dr. Sandler about it. I talked to Dr. Hilliard and anyone else who was in that room at the time which would of course include Dr. Black. I had talked to Ms. Archer. I had talked

to the various doctors preceding Dr. Freeman. Let's see. The doctor after Dr. Freeman was—

Q. Sir, we're only talking about people that were employed by HCHD. None of the doctors are employed by HCHD.

A. Uh-huh.

Q. So let's talk about Dr. Hilliard. This is the conversation where you claim to have to have told her about you didn't like the overtime you were getting; is that correct?

A. This was—it was not a conversation.

Q. It was in response to her asking about as much additional overtime as I possibly could under what they were doing and that my legs would not hold up anymore.

Q. And you feel that this discussion of your not wanting additional overtime was notification of a disability?

A. As I also told her of the reason, yes.

Q. The reason—

A. Being the legs.

Q. The legs. That your legs hurt, you couldn't work overtime. And that is the notification of a disability?

A. Not the legs hurt, but that I had venous stasis. This also showed up in my letter to her previously.

Eber is presumably referring a letter he claims he wrote Dr. Hilliard on November 9, 1995, which states:

Despite many complaints I have made, concerning the amount of overtime I have had to work, my superiors have continued a policy of forced overtime. Note this on the copy of my last PAYROLL slip, enclosed. Also, so far this week, from Monday to Wednesday, I have already worked eleven hours of overtime, including a fourteen hour day on Tuesday.

On Wednesday, when I left work, I was extremely tired and almost went to sleep at the wheel, driving home. When I came in on Thursday I discovered that I had not punched out. I filled the missing time on my punch card (copy enclosed). From my Gamma Camera's computer log I can show that I started my last patient at 17:23:10 on 11/8/95 and took 32 frames at 40.000 sec/frame. Transportation logs show that they picked up patient Jones, Lyndia at 6:05 P.M. I processed the scan, shut of [sic] the machines, closed up Nuclear Medicine and left the building at approx. 6:30 P.M.

I have been informed, by my supervisor, that because I didn't log out I would not be paid for this eleven hour day. I hope that you can clear this matter up. Not only is it wrong to withhold payment for work done, I find it unconscionable for this hospital to force me to work overtime to the point that I can't function in a clear headed manner, and then to say that, because I forgot to punch out, I'm not going to get paid.

Contrary to the excerpt from his deposition, Eber did not mention venous stasis in this letter, as he later conceded at deposition. It is apparent that Eber's complaints to his supervisors focused on the extent of overtime he was being required to work, not on any allegedly disabling physical condition.

Interestingly, in his charge of discrimination filed with the EEOC, Eber did not identify a specific disability, allude to any problems with his legs, or mention any difficulties with standing or walking. Moreover, he admitted at deposition that six months before his transfer, he had stopped working overtime at HCHD unless it was an emergency:

Q. Okay. So as of 3/27/97, y'all were told not to be incurring overtime; is that correct?

A. I believe it was earlier than that.

Q. Okay. So did y'all follow those rules and not incur overtime during that period of time?

A. Unless it was an emergency, no.

Q. Okay. Let me—that didn't sound— so y'all followed those directives back in

the 3/27/97 time period and abstained from taking overtime unless it was an emergency; is that correct?

A. Yes.

Most significantly, Eber obtained another job as a nuclear medical technician within days of his transfer. When Eber filled out an application for insurance with his new employer, Lieber & Moore, he was asked if he was "unable to work because of any physical, mental, emotional condition, injury or illness?" Eber checked, "No." Eber further declared that "all answers on this form are true and complete to the best of my knowledge. I understand that any misstatements or failure to report information may be used as the basis for rescission of insurance for me and my dependents (if any), subject to the provision entitled Time Limits on Legal Actions and Certain Defenses." At deposition, Eber testified that he never informed Lieber & Moore of his venous stasis or requested an accommodation for his alleged disability:

Q. Okay. Prior to your employment with Lieber & Moore, had you ever informed them of your need for accommodation or your alleged disability?

A. No, I hadn't.

Q. Okay. You never told them that you had this alleged disability?

A. I don't believe I did.

Q. Did you ever tell them anything after you stated that you had an alleged disability or that you had a disability or a need for accommodation?

A. No sir, I didn't.

Q. Did you ever tell them anything after you stated that you had an alleged disability or that you had a disability or a need for accommodation?

A. No sir, I didn't.

Q. Okay. Why didn't you ask for an accommodation with Lieber & Moore?

A. Because, sir, I was working an eight-hour day and working an eight-hour day, I didn't really need any huge accommodation other than resting my foot which I did. And other than the fact that I could sit down when I was doing my work at the counter without being harassed, I could also put my foot up on the stool when I was doing my paperwork without being harassed was sufficient. I didn't need anything past that.

Although Eber asserted at deposition that he did not work overtime at Lieber & Moore, his time sheets indicate to the contrary. The records reflect that Eber often worked more than eight hours per day and more than forty hours per week when employed by Lieber & Moore. A review of his time sheets reveals that out of his twenty-seven weeks on the job (beginning with his first full week on October 10, 1997, and ending on April 10, 1998), Eber worked overtime during twelve of those weeks. In fact, he worked longer hours at Lieber & Moore than he did during his last six months at HCHD. His time sheets reflect that at HCHD, Eber worked an average of 37.7 hours per week between March 30, 1997, and September 13, 1997, while at Lieber & Moore, he worked an average of 39.5 hours per week between October 10, 1997, and April 10, 1998.

Hence, the record establishes that at the time of his transfer, Eber was fully capable of performing all major life activities without substantial limitation. He admitted as much in his application for insurance at Lieber & Moore, signed shortly after his resignation from HCHD. Eber was able to walk, stand, and perform his nuclear medicine duties at both HCHD and Lieber & Moore. Although he may have needed to rest his legs occasionally, he was not suffering from a "disability" protected by the ADA. Other courts considering similar situations have agreed. *See Williamson v. Hartmann Luggage Co.*, 34 F.Supp.2d 1056, 1062 (M.D.Tenn. 1998) (plaintiff's inability to stand or walk more than half a workday because of chronic venous stasis does not in and of itself translate to a substantial limitation on the major life activities of walking and/or standing); *see also Penny v. United*

*Parcel Serv.,* 128 F.3d 408, 415 (6th Cir. 1997) (plaintiff's claim that it hurt to walk did not rise to level of disability); *Kelly v. Drexel Univ.,* 94 F.3d 102, 106–107 (3d Cir.1996) (plaintiff's degenerative joint disease which limited his ability to walk was an impairment, but it did not support a finding that one of his major life activities was substantially limited); *Horth v. General Dynamics Land Sys.,* 960 F.Supp. 873, 878 (M.D.Pa.1997) (plaintiff's inability to sit or stand for more than two hours at a time without having difficulty did not substantially limit a major life activity); *Burnett v. Western Resources, Inc.,* 929 F.Supp. 1349, 1356 (D.Kan.1996) ("plaintiff's restriction on walking no more than four hours per day is not a substantial limitation on the major life activities of walking or working"); *Kriskovic v. Wal-Mart Stores, Inc.,* 948 F.Supp. 1355, 1361 (E.D.Wis.1996) (plaintiff's ankle injury limiting his ability to walk, stand, lift, push, pull, and climb was not a substantial limitation on a major life activity); *Stone v. Entergy Servs., Inc.,* No. 94–2669, 1995 WL 368473, at *3 (E.D.La. June 20, 1995) (plaintiff with partial paralysis, muscle weakness, and uneven legs as residual effects of polio who testified that he had limited endurance, experienced difficulty climbing stairs, and walked significantly slower than average person found not to be substantially limited in ability to walk); *Graver v. National Eng'g Co.,* No. 94–C–1229, 1995 WL 443944, at *11 (N.D.Ill. July 25, 1995) (employee with ankle ailments, including arthritis, causing significant pain when walking and walking with a pronounced limp was not disabled under ADA); *Richardson v. William Powell Co.,* No. C–1–93–528, 1994 WL 760695, at *3, 7 (S.D.Ohio Nov.10, 1994) (plaintiff's degenerative arthritis in her hip, which caused her to limp and experience difficulty climbing stairs did not interfere with a major life activity). Eber's alleged disability did not preclude him from caring for himself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working generally. In short, no major life activities were impaired by his venous stasis.

The evidence also fails to demonstrate that Eber's venous stasis prevented him from performing an entire class of jobs, or even a broad range of jobs. A court must reject "plaintiff's argument that [he] was substantially limited in the activity of working where [his] condition only restricted [his] performance of one job . . . ." *Paleologos v. Rehab Consultants, Inc.* 990 F.Supp. 1460, 1465 (N.D.Ga.1998). Indeed, Eber does not even contend that his condition prevented him from working as a nuclear medicine technician or supervisor, as he reported no problem for the first six months while employed at Lieber & Moore, despite his frequent overtime work. Thus, while Eber's condition may have caused him some difficulty, he has not demonstrated that in September 1997 he had an impairment that substantially limited a major life activity, including the activity of working. Stated simply, Eber has not shown that he had a disability cognizable under the ADA when employed by HCHD.

Likewise, Eber has failed to produce evidence that he had a record of an impairment. *See* 42 U.S.C. § 12102(2)(B); *Sherrod,* 132 F.3d at 1120; *see also Pryor,* 138 F.3d at 1028; *Robinson,* 101 F.3d at 37. "Although the ADA does not define 'record of impairment,' the regulations provide: 'Has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more of the major life activities.'" *Sherrod,* 132 F.3d at 1120 (quoting 29 C.F.R. § 1630.2(k)); *see Pryor,* 138 F.3d at 1028 (finding that record of injury to neck and subsequent surgery, hospitalization, and inability to work for two years did not establish as a matter of law that employee had a record of a disability for purposes of the ADA); *Ray,* 85 F.3d at 227 (holding that an inability to perform continuous, heavy lifting or an inability to perform a particular job do

not necessarily constitute a record of disability).

In order to prevail on a claim for discrimination based on a record of an impairment, the plaintiff must show that at some point in the past, he was classified or misclassified as having a mental or physical impairment that substantially limited a major life activity. *See Sherrod,* 132 F.3d at 1120–21 (finding that prior back surgery and disability leave of absence failed to show that impairment significantly limited a major life activity); *Burch,* 119 F.3d at 321 (record of treatment for alcoholism did not establish a record of a disability as there was no indication that even untreated alcoholism substantially limited any major life activity); *Rogers,* 87 F.3d at 759 (employee's 13% permanent, partial disability rating did not establish a record of an impairment in the absence of evidence connecting the impairment with an inability to perform numerous jobs or other of life's ordinary functions); *Dutcher,* 53 F.3d at 726–27 (refusing to find an employee disabled while noting that the "record of" an impairment must be of the type that substantially limits a major life activity). Although the evidence may suggest a record of an impairment, it does not establish a record of a disability, where, as here, the impairment is not shown to have substantially limited a major life function. *See Robinson,* 101 F.3d at 37 (advising supervisor of asbestosis diagnosis and having condition noted in personnel file were evidence of history of an impairment but not of a disability because it did not substantially limit a major life activity). Hence, having no disability cognizable under the ADA, Eber has failed to adduce sufficient summary judgment evidence that he had a record of having an impairment that substantially limited a major life activity. *See Hamilton,* 136 F.3d at 1051.

Similarly, Eber has not shown that he was regarded by others as having such an impairment, nor has he demonstrated that he was treated as having such an impairment. *See Deas,* 152 F.3d at 481–82; *Pryor,* 138 F.3d at 1028; *Sherrod,* 132 F.3d at 1121. "Under the ADA, an individual may qualify as 'disabled' if he or she is 'regarded as' having an impairment that substantially limits one or more major life activities." *Deas,* 152 F.3d at 475 (citing *Burch,* 119 F.3d at 322; *Bridges,* 92 F.3d at 332). Under the EEOC's implementing regulations, an employee qualifies for protection under the ADA's "regarded as" prong in three situations:

> "One is regarded as having a substantially limiting impairment if the individual (1) has an impairment which is not substantially limiting but which the employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment."

*Id.* (quoting *Bridges,* 92 F.3d at 332); *accord Zenor,* 176 F.3d at 859; *see* 29 C.F.R. § 1630.2(1)-(3). "Under the 'regarded as' prong, the disability status of the plaintiff turns not on the plaintiff's physical condition, but rather on how the plaintiff was perceived and treated by those alleged to have taken discriminatory action." *Deas,* 152 F.3d at 476 n. 9.

To make a *prima facie* showing of disability under this provision, the plaintiff must produce sufficient evidence for a reasonable trier of fact to conclude that the employer perceived him, however erroneously, as having an impairment that substantially limited one or more of his major life activities. *See Zenor,* 176 F.3d at 860; *Deas,* 152 F.3d at 476; *Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 143 (3d Cir.1998); *Pryor,* 138 F.3d at 1028; *Hamilton,* 136 F.3d at 1051; *Sherrod,* 132 F.3d at 1121; *see also Francis v. City of Meriden,* 129 F.3d 281, 285 (2d Cir.1997). "For an employer to regard an impairment as substantially limiting work, the employer must regard an individual as significantly restricted in his ability to perform a class or

broad range of jobs." *Hamilton*, 136 F.3d at 1051–52 (citing *Burch*, 119 F.3d at 322; *Bridges*, 92 F.3d at 332). " '[A]n employer does not necessarily regard an employee as having a substantially limiting impairment simply because it believes she is incapable of performing a particular job.' " *Pryor*, 138 F.3d at 1028 (quoting *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 192 (5th Cir.1996)). "An employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on his ability to work in general." *Foreman*, 117 F.3d at 807 n. 10 (citing *Chandler*, 2 F.3d at 1393); *see Deas*, 152 F.3d at 481 n. 22; *Forrisi*, 794 F.2d at 934. Furthermore, if the employer's belief corresponds to the employee's or his physician's description of his limitations, the employer cannot be viewed as improperly regarding him as disabled. *See Byrne v. Board of Educ.*, 979 F.2d 560, 567 (7th Cir.1992); *Bernard v. Doskocil Cos., Inc.*, 861 F.Supp. 1006, 1013 n. 13 (D.Kan.1994).

Here, Eber remained employed by HCHD after he allegedly reported his condition to his supervisors. He continued to hold all of his previous responsibilities and duties following the notification. HCHD obviously did not regard Eber as physically impaired, as he continued to be assigned regular duty tasks as well as substantial overtime. In fact, Eber complained at deposition that Dr. Black told him that he "was embarrassing [sic] [himself], that nobody there was interested in [his] legs and that [he] should not be such a wuss about it."

Therefore, because Eber has not shown that he suffered from an impairment that substantially limited a major life activity, had a record of such an impairment, or was regarded as having such an impairment, he has failed to establish that he had a disability within the purview of the ADA. Accordingly, he is unable to present a *prima facie* case of disability discrimination.

### 2. Statute of Limitations

#### a. Title I

"Although the ADA does not contain an explicit statute of limitations, Title I [of the ADA] incorporates by reference the remedial provisions of Title VII of the Civil Rights Act of 1964." *McNeill v. Atchison, Topeka, & Santa Fe Ry. Co.*, 878 F.Supp. 986, 989 (S.D.Tex.1995) (citing 42 U.S.C. § 12117(b) (incorporating by reference 29 U.S.C. § 701 *et seq.*)); *see Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996); *Conner v. Reckitt & Colman, Inc.*, 84 F.3d 1100, 1102 (8th Cir.1996); *Millon v. Johnston*, No. Civ. A. 98–2235, 1999 WL 104413, at *3 n.2 (E.D.La. Feb. 19, 1999). To maintain a claim under Title I of the ADA, as with a claim under Title VII of the Civil Rights Act, an aggrieved employee must file a timely charge of discrimination with the EEOC or equivalent state agency and receive a right-to-sue letter prior to filing suit in federal court. *See Dao*, 96 F.3d at 788–89; *Wagner*, 939 F.Supp. at 1308. In a deferral state such as Texas, the employee must file his charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e–5(e)(1); *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir.2000); *Webb v. Cardiothoracic Surgery Assocs. of N. Tex., P.A.*, 139 F.3d 532, 537 (5th Cir. 1998); *Griffin v. City of Dallas*, 26 F.3d 610, 612–13 (5th Cir.1994); *Anson v. University of Tex. Health Science Ctr.*, 962 F.2d 539, 540 (5th Cir.1992); *Thibodeaux v. Transit Mix Concrete & Materials Co.*, 3 F.Supp.2d 743, 745 (E.D.Tex.1998). A civil action must be commenced within ninety days after the charging party receives his right-to-sue letter. *See* 42 U.S.C. § 2000e–5(f)(1); *Dao*, 96 F.3d at 789.

Generally, the limitation period begins on the date the discriminatory act occurred, and a plaintiff cannot sustain his claim based on incidents that occurred more than 300 days before the filing of a

charge of discrimination. *See Webb,* 139 F.3d at 537; *Messer,* 130 F.3d at 134; *Waltman v. International Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989). Any act occurring outside the applicable filing period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *see Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434 n. 12 (5th Cir.1995); *Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 199 (5th Cir. 1992); *Merrill v. Southern Methodist Univ.,* 806 F.2d 600, 604 n. 5 (5th Cir. 1986); *Downey v. Southern Natural Gas Co.,* 649 F.2d 302, 305 (5th Cir.1981). The Fifth Circuit has adopted a discovery rule for determining when a party's claim under the ADA accrues. *See Burfield v. Brown, Moore & Flint, Inc.,* 51 F.3d 583, 589 (5th Cir.1995); *Thibodeaux,* 3 F.Supp.2d at 745. An ADA cause of action accrues "when the employee receives unequivocal notice of facts giving rise to his claim or a reasonable person would know of the facts giving rise to a claim." *Burfield,* 51 F.3d at 589; *see Holmes,* 145 F.3d at 684; *Thibodeaux,* 3 F.Supp.2d at 745.

▮ The 300–day limitation period, however, is subject to waiver, estoppel, and equitable tolling. *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Santa Maria,* 202 F.3d at 1176; *Briones v. Runyon,* 101 F.3d 287, 289 (2d Cir.1996); *Conaway v. Control Data Corp.,* 955 F.2d 358, 362 (5th Cir.), *cert. denied,* 506 U.S. 864, 113 S.Ct. 186, 121 L.Ed.2d 131 (1992); *Blumberg v. HCA Mgmt. Co.,* 848 F.2d 642, 644 (5th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 781 (1989); *Thibodeaux,* 3 F.Supp.2d at 745. The Fifth Circuit has drawn a distinction between equitable estoppel and the more general concept of equitable tolling. *See Amburgey v. Corhart Refractories Corp.,* 936 F.2d 805, 810 n. 14 (5th Cir.1991); *Rhodes v. Guiberson Oil Tools Div.,* 927 F.2d 876, 878 (5th Cir.), *cert. denied,* 502 U.S. 868, 112 S.Ct. 198, 116 L.Ed.2d 158 (1991). "A defendant is equitably estopped from asserting that a claim is time-barred where its conduct induced a plaintiff to refrain from exercising its rights." *Amburgey,* 936 F.2d at 810 n. 14; *see Coke v. General Adjustment Bureau, Inc.,* 616 F.2d 785, 790 (5th Cir.1980), *modified on reh'g,* 640 F.2d 584, 595 (5th Cir.1981). In contrast, " ' "[e]quitable tolling focuses on the plaintiff's excusable ignorance of the employer's discriminatory act." ' " *Amburgey,* 936 F.2d at 810 n. 14 (quoting *Rhodes,* 927 F.2d at 878 (quoting *Felty v. Graves–Humphreys Co.,* 785 F.2d 516, 519 (4th Cir.1986))); *see Santa Maria,* 202 F.3d at 1178; *Clark v. Resistoflex Co.,* 854 F.2d 762, 769 n. 4 (5th Cir.1988). "[E]quitable estoppel and tolling intertwine where the clock is stopped, because a defendant has misled a plaintiff, until the plaintiff knows or should know the truth." *Amburgey,* 936 F.2d at 810 n. 14. In any event, the plaintiff bears the burden of demonstrating a factual basis to justify tolling of the limitation period. *See Hood v. Sears, Roebuck & Co.,* 168 F.3d 231, 232 (5th Cir.1999); *Conaway,* 955 F.2d at 362; *Blumberg,* 848 F.2d at 644.

The Fifth Circuit has not recognized a plaintiff's excusable ignorance of the defendant's discriminatory act as a basis for equitable tolling. *See Amburgey,* 936 F.2d at 810 n. 14 (citing *Barrow v. New Orleans S.S. Ass'n,* 932 F.2d 473, 477–78 (5th Cir. 1991)). The court, however, has held equitable tolling to apply in a variety of situations, including: (1) during the pendency of an action between the same parties in the wrong forum; (2) until the plaintiff knows or should know the facts giving rise to his claim; and (3) when the EEOC misleads the plaintiff about the nature of his rights. *See Hood,* 168 F.3d at 232; *Wilson v. Secretary, Dep't of Veterans Affairs,* 65 F.3d 402, 404 (5th Cir.1995); *Amburgey,* 936 F.2d at 810 n. 14; *Blumberg,* 848 F.2d at 644; *Chappell v. Emco Mach.*

*Works Co.*, 601 F.2d 1295, 1302–03 (5th Cir.1979). The court has further indicated that other circumstances might similarly merit the application of equitable tolling. *See Hood*, 168 F.3d at 232; *Blumberg*, 848 F.2d at 644.

Nonetheless, "[e]quitable tolling is an extraordinary remedy appropriate only in a narrow class of fact situations." *Kerver v. Exxon Prod. Research Co.*, No. H–85–1525, 1986 WL 8872, at *2 (S.D.Tex. May 15, 1986), *aff'd*, 810 F.2d 196 (5th Cir.1987). "Federal courts have taken a uniformly narrow view of equitable exceptions to the Title VII limitations period." *David v. Trugreen Ltd. P'ship*, No. 3:96–CV–3078–P, 1999 WL 288686, at *9 (N.D.Tex. May 5, 1999) (citing *Thornton v. South Cent. Bell Tel. Co.*, 906 F.Supp. 1110, 1118 (S.D.Miss.1995)); *see also Lopez v. Citibank, N.A.*, 808 F.2d 905, 906 (1st Cir.1987); *Earnhardt v. Puerto Rico*, 691 F.2d 69, 71 (1st Cir.1982); *Lloret v. Lockwood Greene Eng'rs, Inc.*, No. 97 Civ. 5750(SS), 1998 WL 142326, at *3 (S.D.N.Y. Mar.27, 1998); *Koontz v. Hoge, Fenton, Jones & Appel, Inc.*, No. C 95–20629 JW, 1996 WL 417257, at *3–4 (N.D.Cal. July 22, 1996). There is no absolute rule that requires tolling based on mental disability. *See Biester v. Midwest Health Servs., Inc.*, 77 F.3d 1264, 1268 (10th Cir.1996); *Lopez*, 808 F.2d at 906; *David*, 1999 WL 288686, at *9 (citing *Wilson v. West*, 962 F.Supp. 939, 946–47 (S.D.Miss.1997)); *see also Koontz*, 1996 WL 417257, at *3–4. Although common law tends to permit insanity to toll a limitation period, "a long line of federal cases explicitly holds that mental disability, even rising to the level of insanity, simply does not toll a federal statute of limitations." *Lopez*, 808 F.2d at 906 (citing *Accardi v. United States*, 435 F.2d 1239, 1241 n. 2 (3d Cir.1970); *O'Hara v. Kovens*, 473 F.Supp. 1161, 1167 (D.Md. 1979), *aff'd*, 625 F.2d 15 (4th Cir.1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981); *Jackson v. United States*, 234 F.Supp. 586, 587 (E.D.S.C. 1964)); *see Wilson*, 962 F.Supp. at 947.

As the Tenth Circuit observed in *Biester*, "[t]he few courts which have recognized an exception for mental incapacity have limited the application of this equitable doctrine to exceptional circumstances." 77 F.3d at 1268.

The First Circuit has held that "a federal court should assume that mental illness was not of the sort that makes it equitable to toll the statute—at least absent a strong reason for believing the contrary." *Lopez*, 808 F.2d at 907. The United States Supreme Court has also counseled against any broadening of equitable tolling in the employment discrimination context. *See Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) ("[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants"). This district has found that there is "no basis in law for equitable tolling where an employee claims that he did not file a charge because he was depressed or otherwise psychologically impaired due to his being discharged." *Kerver*, 1986 WL 8872, at *2. The Northern District of Texas has declined to toll the statute despite a psychiatrist's description of the plaintiff as "delusional concerning his place of employment, including homicidal ideation." *David*, 1999 WL 288686, at *2. Another district court has refused to toll limitations for a deaf and mentally impaired plaintiff who was represented by counsel, although she became deeply depressed immediately after her termination and "could not have articulated her civil rights allegation." *Romano v. A.T. Cross Co.*, 39 F.Supp.2d 143, 144–46 (D.R.I.1999). Cumulatively, these holdings suggest that only the most severe mental disorder will toll the running of limitations. *See Lopez*, 808 F.2d at 907; *David*, 1999 WL 288686, at *9; *Romano*, 39 F.Supp.2d at 146; *Wilson*, 962 F.Supp. at 946–47.

In evaluating whether a particular litigant is entitled to the benefit of equitable

tolling, courts engage in a case-specific factual analysis. *See Boos v. Runyon,* 201 F.3d 178, 184–85 (2d Cir.2000) (holding "paranoia, panic attacks, and depression" insufficient to justify further inquiry into tolling); *Lopez,* 808 F.2d at 907; *Wilson,* 962 F.Supp. at 946–47. When determining whether a given mental disorder justifies the tolling of limitations, courts have focused on such factors as: (a) the plaintiff's representation by counsel; (b) the plaintiff's capacity to work; (c) the plaintiff's ability to execute legal documents; (d) the degree to which the plaintiff was able to interact with others; (e) medical evidence "regarding any mental, emotional or psychological problem" that the plaintiff endured; and (f) an adjudication of incompetency or a hospitalization for mental incapacity. *See Hood,* 168 F.3d at 232–33 (finding tolling inapplicable where the plaintiff was able to retain counsel before the deadline for filing her EEOC charge expired, stating that "this fact indicates that her mental state did not prevent her from pursuing her legal rights under Title VII during the filing period"); *Biester,* 77 F.3d at 1268 (denying tolling where the plaintiff was not adjudged incompetent or institutionalized and was represented by counsel throughout the filing period); *Lopez,* 808 F.2d at 907 (rejecting equitable tolling where the plaintiff was represented by counsel during the limitation period); *Hartnett v. Chase Bank of Texas Nat'l Ass'n,* 59 F.Supp.2d 605, 614 (N.D.Tex. 1999); *David,* 1999 WL 288686, at *9; *Kerver,* 1986 WL 8872, at *2. To invoke equitable tolling, judicial precedent clearly charges the plaintiff with demonstrating that "he was mentally impaired to the extent that he could not file his Charge of Discrimination." *David,* 1999 WL 288686, at *9; *see also Hood,* 168 F.3d at 232. Where the plaintiff is unable to present convincing evidence that equity demands a tolling of the limitation period, summary judgment is appropriate. *See id.*

▇▇ In the case at bar, Eber was informed that he would be transferred from LBJ to Ben Taub on September 8, 1997, and the transfer occurred on September 10, 1997. Assuming, *arguendo,* that the transfer amounted to a discriminatory demotion, under usual circumstances, for his charge of discrimination to have been timely, Eber would have been required to file it by July 7, 1998. Here, Eber filed his charge with the EEOC on April 28, 1999, some 295 days after the limitations period would normally have expired. Eber, however, claims that his mental incompetence, depression, and extended comatose state prevented him from timely filing his charge with the EEOC and that equity should prevent the statute of limitations from running against his claim. In support of this assertion, Eber provides his own affidavit as well as the affidavit of Dr. Flowers, the psychiatrist he saw on September 9, 1998.

According to Dr. Flowers's affidavit, dated May 2, 2000:

I evaluated Stephen R. Eber (Date of Birth 10–29–46) September 9, 1998. Patient was previously at Methodist Hospital from 6–98 to 7–26–98 due to aortic valve problem stemming from a severe leg condition. Patient underwent heart-valve surgery and thereafter lapsed into a coma and was on a respirator. Patient became significantly depressed and could not physically work or function normally in daily activities. Patient was diagnosed with MDD (Major Depression) caused by sudden health problems. He was started on Prozac and was increased to 30 mg. Patient did not return to somewhat normal functioning for at least 9 months.

In his affidavit, Eber recounted his medical problems and the period following his surgeries:

On April 14, 1998, I was admitted to Cypress Fairbanks for problems with my legs. I was released from the hospital on April 27, 1998. However, I had to enter the hospital again because of heart problems caused by the leg infection. I was transferred to Methodist Hospital

for heart surgery on June 6, 1998. After open heart surgery and while I was in the recovery room I found I could not breathe at one point and I was placed on a respirator. Also, I had renal failure and was placed on dialysis while I was at Methodist Hospital. I remember little of what went on until shortly before my discharge from Methodist Hospital on July 26, 1998.

I became very depressed after these complications and medical conditions. My wife took a special leave from her work so that she could be with me during this time. She encouraged me repeatedly to see a psychiatrist and I saw Dr. Larry Flowers. Dr. Flowers proscribed Prozac. I was very depressed. For many months I could not do tasks such as driving a car, shopping for groceries, paying bills and in fact I was in a zombie-like state and unable to function.

Under the circumstances, equitable tolling would appear to be appropriate for the time period Eber was in a coma. Although the precise dates are unclear, Eber was comatose sometime between his "multi-systemic organ failure and hypoxic encephalopathy" on June 13, 1998, and his discharge from Methodist Hospital on July 26, 1998. In any event, assuming that equity could further operate to toll the statute for the entire period of Eber's 1998 hospitalizations (regardless of his conscious state), that period could most generously be calculated as running from April 14, 1998, through July 26, 1998, a 103-day period. As previously stated, under normal circumstances, Eber's filing with the EEOC would have been 295 days too late. Even if the statute were tolled during Eber's hospitalizations, however, Eber's filing was still tardy by 192 days. "Equitable tolling is not a basis for 'skipping entirely over the "initial charge." ' " *Hernandez Arce v. Bacardi Corp.,* 37 F.Supp.2d 112, 116 (D.P.R.1999) (quoting *Kizas v. Webster,* 707 F.2d 524, 546 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984)).

Nothing in Dr. Flowers's affidavit justifies tolling beyond the period of Eber's hospitalizations. In the affidavit, Dr. Flowers makes conclusory statements that Eber "became significantly depressed and could not physically work or function normally in daily activities." Similar affidavits of physicians characterizing a plaintiff as incapacitated during the limitations period have been deemed insufficient to toll the running of the statute, especially when refuted by evidence to the contrary. *See Lopez,* 808 F.2d at 906–07; *Decrosta v. Runyon,* Nos. 90–CV–1269, 90–CV–585, 1993 WL 117583, at *3 (N.D.N.Y.1993). Dr. Flowers's notes from Eber's sole visit on September 9, 1998, indicate that although Eber reported that he was depressed, was having problems with his memory, and could not concentrate, he was able to give Dr. Flowers a fairly detailed description of his prior medical history as well as his family, employment, and educational history. He also reported that he was "sleeping well" and was "dieting," reducing his weight from 300 to 234 pounds. Eber further stated that he was at times energetic, that he was using a treadmill, and that his mood varied, sometimes feeling that "everything would be alright." These notations are inconsistent with Eber being even close to *"non compos mentis." See Helton v. Clements,* 832 F.2d 332, 336 (5th Cir.1987) (finding that depression did not render the plaintiff unable to manage his affairs or comprehend his legal rights, only that it distracted him from pursuing his cause of action, which did not warrant equitable tolling).

Moreover, because Dr. Flowers's medical records indicate that he saw Eber on only one occasion, September 9, 1998, he does not appear to be competent to opine on Eber's mental condition during the ensuing eight months prior to the filing of the EEOC charge on April 28, 1999. In summary judgment proceedings under both federal and state law:

Supporting and opposing affidavits shall be made on personal knowledge, shall

set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. FED. R. CIV. P. 56(e); TEX. R. CIV. P. 166a(f). Affidavits that do not comply with these requirements are legally insufficient and are entitled to no weight. *See Williamson v. United States Dep't of Agric.,* 815 F.2d 368, 383 (5th Cir.1987); *Pan-Islamic Trade Corp. v. Exxon,* 632 F.2d 539, 556 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex.1996); *Humphreys v. Caldwell,* 888 S.W.2d 469, 470–71 (Tex. 1994). Dr. Flowers's affidavit does not satisfy these prerequisites, as there is no indication that he has personal knowledge of Eber's state of mind after September 9, 1998, nor does it affirmatively show that Dr. Flowers is competent to testify to such matters. *See Pedraza v. Jones,* 71 F.3d 194, 197 (5th Cir.1995) (affidavits not sufficient to defeat summary judgment where contained only conclusory statements and affiant possessed no personal knowledge of another's mental condition); *Richardson v. Oldham,* 12 F.3d 1373, 1378 (5th Cir.1994) (affidavits stricken where not based on personal knowledge and not sufficiently specific).

In his own affidavit, Eber states that he was "very depressed," adding that "[f]or many months I could not do tasks such as driving a car, shopping for groceries, paying bills and in fact I was in a zombie-like state and unable to function." Eber's alleged inability to perform physical work or to function normally in daily activities, however, does not operate to suspend the running of limitations. *See Hartnett,* 59 F.Supp.2d at 614 (plaintiff's inability to "conduct himself in any reasonable manner or focus any energy on his employment" did not toll the statute); *David,* 1999 WL 288686, at *2; *Romano,* 39 F.Supp.2d at 144–46. Depression alone does not toll the statute of limitations. *See Biester,* 77 F.3d at 1266–68 (finding no "exceptional circum-

stances" warranting equitable tolling although the plaintiff was hospitalized for "major depression" on three occasions during filing period and claimed to have "had absolutely no concept of time, date, or day"); *Hartnett,* 59 F.Supp.2d at 614 (refusing to toll limitations for plaintiff suffering from depression who had been prescribed Prozac); *Zillyette v. Capital One Fin. Corp.,* 1 F.Supp.2d 1435, 1440 (M.D.Fla.1998), *aff'd,* 179 F.3d 1337 (11th Cir.1999) (equitable tolling not available to plaintiff who alleged that he was severely distraught, very depressed, had suicidal ideation, and experienced headaches and insomnia); *Pauling v. Secretary of Dep't of Interior,* 960 F.Supp. 793, 804 (S.D.N.Y. 1997) (denying tolling on the basis of plaintiff's "major depressive episode" where plaintiff's mental illness prevented him from working but did not prevent him from making a Title VII claim); *Decrosta,* 1993 WL 117583, at *3 (rejecting tolling on a Title VII claim where plaintiff was "suffering from a major depressive disorder that was more serious than a neurosis and his overall ability to function was severely limited"); *Kerver,* 1986 WL 8872, at *2 (finding "no basis in law for equitable tolling where an employee claims that he did not file a charge because he was depressed or otherwise psychologically impaired").

In this case, Eber's deposition testimony reflects that in mid-September 1998, during the period for which he seeks equitable tolling, he was capable of driving to the offices of the TWC, walking across the parking lot to another building after learning that his first stop was erroneous, and applying for unemployment compensation. He was apparently able to communicate with TWC employees, follow directions, complete an application, and sign his name to a legal document. Eber conceded at deposition that by applying for unemployment compensation, he was telling the TWC that he was ready, able, and willing to go to work. The skills and mental functions he demonstrated are similar to those necessary for filing a charge with the EEOC. A number of courts have denied

equitable tolling under comparable circumstances, where the plaintiff managed to prepare and file other types of claims during the time period in dispute. *See Lloret,* 1998 WL 142326, at *4; *Wilson,* 962 F.Supp. at 945; *Decrosta,* 1993 WL 117583, at *3.

Other courts have found that a physician's release of the plaintiff to return to work dictates against a finding of mental impairment sufficient to warrant equitable tolling. *See David,* 1999 WL 288686, at *9. In this instance, on September 2, 1998, a mere week before he saw Dr. Flowers, Dr. Taxis released Eber to return to work on September 7, 1998. Progress notes dated September 4, 1998, describe Eber as being "alert," "conversant," and in "good spirits," and later notes, dated September 28, 1998, characterize him as "alert" and "conversant." Indeed, on September 8, 1998, the day before Eber saw Dr. Flowers, the office follow-up notes of Dr. Pickett indicate: "Mr. Eber is status post AVR and infections, multiple medical problems and a long hospitalization. He is doing better. He is walking 15 minutes a day on a treadmill, wanting to go back to work. His legs have almost completely healed. He is generally doing quite well." Dr. Pickett adds, "Since he feels up to going back to work, I have approved his return to work."

Therefore, under the totality of the circumstances, Eber has not demonstrated that he suffered from a mental disability sufficiently severe to toll the statute of limitations. The record is devoid of evidence that Eber was mentally impaired in the fall of 1998 to the point where he was unable to file a charge of discrimination with the EEOC. *See Hood,* 168 F.3d at 232; *Biester,* 77 F.3d at 1268; *David,* 1999 WL 288686, at *9. Hence, the running of limitations recommenced upon Eber's discharge from the hospital on July 26, 1998, and expired, at the latest, in November 1998. Thus, because Eber's EEOC charge was untimely when it was filed in April

1999, Eber's claim under Title I of the ADA is time-barred.

b. *Title II*

"Federal law does not provide a limitations period for claims under Title II of the ADA." *Holmes,* 145 F.3d at 683 (citing *Doe v. Milwaukee,* 871 F.Supp. 1072, 1077 (E.D.Wis.1995)); *see Everett v. Cobb County Sch. Dist.,* 138 F.3d 1407, 1409 (11th Cir.1998); *Soignier v. American Bd. of Plastic Surgery,* 92 F.3d 547, 550 (7th Cir.1996), *cert. denied,* 519 U.S. 1093, 117 S.Ct. 771, 136 L.Ed.2d 716 (1997); *Schneider v. San Francisco,* No. C–97–2674–CAL, 1999 WL 144878, at *12 (N.D.Cal. Mar.10, 1999). "The enforcement provision of Title II ... adopts the remedies, procedures, and rights set forth in 29 U.S.C. § 794(a) (the Rehabilitation Act of 1973)." *Holmes,* 145 F.3d at 683 (citing 42 U.S.C. § 12133). "The Rehabilitation Act's coverage is nearly identical to Title II of the ADA, except that it applies only to entities receiving federal funding." *Id.* at 683–84 (citing *Doe,* 871 F.Supp. at 1078). The Rehabilitation Act, like Title II, does not specify a statute of limitations. *See id.* at 684. Where a federal statute does not contain a limitations period, courts generally look to the most analogous state statute of limitations. *See Everett,* 138 F.3d at 1409 (citing *Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)); *Soignier,* 92 F.3d at 550; *Schneider,* 1999 WL 144878, at *12; *Jackson v. Johnson,* 950 F.2d 263, 265 (5th Cir.1992); *Wagner,* 939 F.Supp. at 1310. "Most civil rights actions are essentially claims to vindicate injuries to personal rights." *Everett,* 138 F.3d at 1409 (citing *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 661, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Wilson,* 471 U.S. at 276, 105 S.Ct. 1938). "Based on this guidance from the Supreme Court most circuits that have adopted a statute of limitations for ADA or Rehabilitation Act claims have looked to the state's limitations period for personal injury actions." *Id.* (citing *Soignier,* 92 F.3d at 551; *Baker v. Board*

*of Regents of State of Kan.,* 991 F.2d 628, 632 (10th Cir.1993); *Hickey v. Irving Indep. Sch. Dist.,* 976 F.2d 980, 982–83 (5th Cir.1992); *Morse v. University of Vermont,* 973 F.2d 122, 127 (2d Cir.1992)); *see also Rodriguez v. Holmes,* 963 F.2d 799, 803 (5th Cir.1992) ("[b]ecause no specified federal statute of limitations exists for section 1983 suits, federal courts borrow the residual personal injury limitations period") (citing *Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Burrell v. Newsome,* 883 F.2d 416, 418 (5th Cir.1989)); *Jackson,* 950 F.2d at 265 (citing *Owens,* 488 U.S. at 249–50, 109 S.Ct. 573; *Ali v. Higgs,* 892 F.2d 438, 439 (5th Cir.1990)).

▮▮▮ In Texas, "[t]he general statutory limitation period for personal injury claims is two years, beginning the day after the cause of action accrues." *Grace v. Colorito,* 4 S.W.3d 765, 769 (Tex.App.—Austin 1999, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a)); *see Burns v. Harris County Bail Bond Bd.,* 139 F.3d 513, 518 (5th Cir.1998); *Jackson,* 950 F.2d at 265. Federal civil rights actions instituted in Texas, such as those brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1988, are deemed analogous to personal injury claims, and, therefore, the applicable limitations period is the two years fixed by TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) ("[a] person must bring suit for ... personal injury ... not later that two years after the day the cause of action accrues"). *See Burns,* 139 F.3d at 518; *Rodriguez,* 963 F.2d at 803; *Jackson,* 950 F.2d at 265; *Helton,* 832 F.2d at 334. Hence, the two-year statute of limitation appears to be applicable to claims brought in Texas under Title II of the ADA. *See Wagner,* 939 F.Supp. at 1310; *see also Everett,* 138 F.3d at 1409–10.

▮▮▮ "Although Texas law governs the limitations period, federal law governs when a cause of action accrues." *Burns,* 139 F.3d at 518 (citing *Jackson,* 950 F.2d at 265; *Piotrowski v. City of Houston,* 51 F.3d 512, 516 n. 10 (5th Cir.1995)). "Under federal law, a cause of action accrues 'when the plaintiff knows or has reason to know of the injury which is the basis of the action.'" *Burns,* 139 F.3d at 518 (quoting *Burrell,* 883 F.2d at 418); *accord Gartrell v. Gaylor,* 981 F.2d 254, 257 (5th Cir.1993); *Helton,* 832 F.2d at 334–35.

▮▮▮ "In applying the forum state's statute of limitations, the federal court should also give effect to any applicable tolling provisions." *Id.; see Board of Regents of the Univ. of the State of N.Y. v. Tomanio,* 446 U.S. 478, 483–86, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980); *Jackson,* 950 F.2d at 265 (citing *Hardin v. Straub,* 490 U.S. 536, 542–43, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989)); *Burrell,* 883 F.2d at 418. "[P]roof of facts suspending operation of a statute of limitations is the burden of the party pleading suspension." *Weaver v. Witt,* 561 S.W.2d 792, 794 n. 2 (Tex.1977); *see Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex.1988); *Willis v. Maverick,* 760 S.W.2d 642, 647 (Tex.1988).

In Texas, a statute of limitation is tolled for persons younger than eighteen years of age and those of unsound mind:

§ 16.001. Effect of Disability

(a) For the purposes of this subchapter, a person is under a legal disability if the person is:

(1) younger than 18 years of age, regardless of whether the person is married; or

(2) of unsound mind.

(b) If a person entitled to bring a personal action is under a legal disability when the cause of action accrues, the time of the disability is not included in a limitations period.

(c) A person may not tack one legal disability to another to extend a limitations period.

(d) A disability that arises after a limitations period starts does not suspend the running of the period.

TEX. CIV. PRAC. & REM. CODE ANN. § 16.001.

This "statute provides that when a person is of unsound mind at the time his

cause of action accrues, the applicable statute of limitations will be tolled until the disability is removed." *Helton,* 832 F.2d at 336. The term "unsound mind" is not defined in the Texas Civil Practice and Remedies Code. The Texas Probate Code, however, defined "persons of unsound mind" as "persons *non compos mentis,* mentally disabled persons, insane persons, and other persons who are mentally incompetent to care for themselves or manage their property and financial affairs" until this section was repealed in 1995. TEX. PROB. CODE ANN. § 3(y) (1995). "Generally, the term 'unsound mind' refers to a legal disability, although it is not limited to persons who are adjudicated incompetent." *Hargraves v. Armco Foods, Inc.,* 894 S.W.2d 546, 547 (Tex.App.—Austin 1995, no writ); *see Casu v. CBI Na–Con, Inc.,* 881 S.W.2d 32, 34 (Tex.App.—Houston [14th Dist.] 1994, no writ). "[I]n general, 'persons of unsound mind' and 'insane persons' are synonymous." *Nelson v. Reddy,* 898 F.Supp. 409, 410 (N.D.Tex.1995) (quoting *Hargraves,* 894 S.W.2d at 547); *see Lowery v. Lowery,* 386 S.W.2d 194, 197 (Tex.Civ.App.—Tyler 1965, no writ). Black's Law Dictionary defines a person of unsound mind as referring "to one who from infirmity of mind is incapable of managing himself or his affairs." BLACK'S LAW DICTIONARY 1380 (5th ed.1979). As the Fifth Circuit has explained, "Generally, the term, as used in this setting, has been interpreted to mean that such a person is unable to manage his affairs or to understand his legal rights or liabilities." *Helton,* 832 F.2d at 336; *see Grace,* 4 S.W.3d at 769.

■ "[T]he purpose of the statute is 'to suspend limitations with respect to those who have no access to the courts.'" *Helton,* 832 F.2d at 336 (quoting *Adler v. Beverly Hills Hosp.,* 594 S.W.2d 153, 158 (Tex.Civ.App.—Dallas 1980, no writ)); *see Porter v. Charter Med. Corp.,* 957 F.Supp. 1427, 1437 (N.D.Tex.1997); *Hargraves,* 894 S.W.2d at 548. "The unsound mind exception serves to protect people who are un-

able to participate in, control, or understand the progression and disposition of a lawsuit." *Grace,* 4 S.W.3d at 769 (citing *Hargraves,* 894 S.W.2d at 548); *see Ruiz v. Conoco, Inc.,* 868 S.W.2d 752, 755 (Tex. 1993). Under Texas law, "a person claiming to have been under a legal disability must establish that he was under a disability at the time his cause of ·ction accrued." *Nelson,* 898 F.Supp. at 410 (citing *Helton,* 832 F.2d at 336; *Parker v. Yen,* 823 S.W.2d 359, 362 (Tex.App.—Dallas 1991, no writ)). Thus, it is well established in Texas, that "in order for a plaintiff to be entitled to a tolling of the statute of limitations, he must be 'under a legal disability *when the cause of action accrues,*' and that '[a] disability that arises after a limitations period starts does not suspend the running of the period.'" *Helton,* 832 F.2d at 336 (emphasis in original) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § .16.001(b), (d)).

■ Here, Eber was notified of his impending transfer on September 8, 1997, and his cause of action for employment discrimination, therefore, accrued on that date. At the time, he was fifty years old and was of sound mind, working as a nuclear medicine technician for HCHD and, shortly thereafter, in a similar capacity at Lieber & Moore. Eber's statements "make[ ] clear that he had full awareness as they were occurring of the facts upon which he bases his claims in this action." *Porter,* 957 F.Supp. at 1437. Indeed, Eber does not claim to have been mentally impaired until mid–1998. As in *Nelson,* however, there is "no evidence of a judicial determination of incompetence" nor "any professional's diagnosis that he was mentally incompetent at any time." 898 F.Supp. at 411. Eber filed his federal lawsuit on October 8, 1999, more than two years after his cause of action accrued. Under Texas law, a disability that does not arise until after a cause of action accrues does not serve to toll the limitations period. *See Helton,* 832 F.2d at 336. Consequently, Eber's claims under Title II of

the ADA are foreclosed by the Texas two-year statute of limitation.

### D. Sanctions

According to HCHD, Eber should be sanctioned because of his "sheer lack of concern or respect for the legal and jurisdictional prerequisites to filing suit under the Americans with Disabilities Act." In support of this statement, HCHD lists six factors that it contends should have indicated that bringing suit was frivolous:

(a.) Mr. Eber never grieved his termination (jurisdictional);

(b.) Mr. Eber never timely filed his charge with the EEOC, which removes jurisdiction from the court (jurisdictional bar);

(c.) Mr. Eber never provided notice to his supervisors of an alleged disability or need for accommodation;

(d.) Mr. Eber's conduct was made known to his attorney from the initial weeks of the existence of this case. No attempt to circumvent damage to this defendant has been made;

(e.) Mr. Eber's alleged disability (even if it had been properly communicated to his employer) is not and cannot be a qualified disability. Mr. Eber left the District to work in the offices of Lieber and Moore Cardiology Associates, P.A., which he felt would be more attractive due to the clinical setting; and

(f.) Mr. Eber argues equitable tolling in an attempt to cure his clear failure to exhaust administrative remedies without regard to the 5th Circuit's unwavering denial of mental defects.

Rule 11 of the Federal Rules of Civil Procedure establishes the standard that attorneys and parties must meet when filing documents in federal court. The rule also outlines the enforcement mechanism—court-imposed sanctions. "[R]ule 11 does not impart a continuing duty, but requires only that each filing comply with its terms as of the time the paper is served." *Edwards v. General Motors Corp.*, 153 F.3d 242, 245 (5th Cir.1998) (citing *Thomas v. Capital Sec. Servs. Inc.*, 836 F.2d 866, 874 (5th Cir.1988)). "Before a court can impose a Rule 11 sanction, '[i]t is axiomatic that the court must announce the sanctionable conduct giving rise to its order.'" *Matta v. May*, 118 F.3d 410, 414 (5th Cir.1997) (quoting *Topalian v. Ehrman*, 3 F.3d 931, 937 (5th Cir.1993)). Rule 11 does not allow the imposition of sanctions "merely for the eventual failure of a claim; rather, sanctions are to be applied only where, at the time of the filing, the position advocated is unwarranted." *Id.* (citing *FDIC v. Calhoun*, 34 F.3d 1291, 1300 (5th Cir.1994)). "[R]egardless of whether an attorney's view of the law is erroneous, sanctions can be imposed only if his position can 'fairly be said to be unreasonable from the point of view of both existing law and possible extension, modification or reversal.'" *Id.* at 1296 (quoting *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 444–45 (5th Cir. 1992)). Without engaging in a lengthy discussion of the relative merits of HCHD's request for sanctions, the court, after reviewing the pleadings and the submissions in this case, is of the opinion that Eber's claims are not so wholly lacking in merit as to be sanctionable under Rule 11.

### III. Conclusion

In summary, Eber has not established that he suffered from a disability within the purview of the ADA at the time of the adverse employment action at issue. Furthermore, because Eber did not file an EEOC charge until after the expiration of the 300–day limitation period under Title I and did not file suit until after the running of the two-year statute of limitation under Title II, his action is time-barred. Accordingly, for the reasons set forth above, HCHD's Motion for Summary Judgment is granted. HCHD's request for sanctions is denied.

IT IS SO ORDERED.